In the

# United States Court of Appeals
## For the Seventh Circuit
―――――――

No. 06-3376

LYNNE BLOCH, HELEN BLOCH, and NATHAN BLOCH,

*Plaintiffs-Appellants*,

v.

EDWARD FRISCHHOLZ and SHORELINE TOWERS
CONDOMINIUM ASSOCIATION,

*Defendants-Appellees*.

―――――――

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 05 C 5379—**George W. Lindberg**, *Judge*.

―――――――

ARGUED FEBRUARY 20, 2008—DECIDED JULY 10, 2008

―――――――

Before EASTERBROOK, *Chief Judge*, and BAUER and WOOD,
*Circuit Judges*.

EASTERBROOK, *Chief Judge*. In September 2001 the Shore-
line Towers Condominium Association adopted rules
for the hallways of its building at 6301 North Sheridan
Road in Chicago. The rules provide, among other things,
that "[m]ats, boots, shoes, carts or objects of any sort" may
not be placed outside owners' doors. The rules also pro-
hibit signs on doors or in hallways. Lynne Bloch, who was
on the association's board and chaired the committee that

devised these rules, did not imagine that they would affect the mezuzah on the doorpost of her unit. For several years they did not. But when the hallways were repainted in 2004 all mezuzot and other religious signs and symbols were removed. Bloch affixed another; the association had it, too, removed, in reliance on the rules.

By the time Bloch and her family filed this suit under sections 804 and 817 of the Fair Housing Act, 42 U.S.C. §§ 3604, 3617, and one of the implementing regulations, 24 C.F.R. §100.400(c)(2), the association's board had adopted a religious exception to the hallway rules and instructed the custodial staff to leave mezuzot, crucifixes, and other items of religious significance in place. The Blochs demanded damages for distress they had suffered in the interim, plus an injunction to prevent the association from returning to its old ways. The district court granted summary judgment for the association and its president, Edward Frischholz, relying on *Halprin v. Prairie Single Family Homes of Dearborn Park Association*, 388 F.3d 327 (7th Cir. 2004).

We observed in *Halprin* that §804(b) forbids discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling" but does not address discrimination after ownership has changed hands—and that §817, on which the regulation rests, makes it unlawful to interfere with a person in the enjoyment of rights under §804 (and some other sections) but does not enlarge any of those rights. This means, *Halprin* held, that religiously motivated harassment of owners or tenants does not violate the Fair Housing Act or its regulations. Conflicts among owners, we concluded, must be addressed under state law (including the law of property, contracts, and voluntary associations, in addition to any state civil-rights laws).

*Halprin* allowed that religious discrimination or harassment so severe that it amounts to constructive eviction might be equated to making a dwelling unavailable on religious grounds, and thus violate §804(b). See 388 F.3d at 329. The Blochs contend that an observant Jew must have a mezuzah at every entrance, and that to forbid all mezuzot therefore is to forbid occupancy by all adherents to Judaism. That is constructive eviction, the Blochs maintain. To address this argument, we would need to know whether the Blochs' religious obligation can be met only by a mezuzah on the hallway-facing side of each doorpost; a mezuzah or other religious artifact attached to the frame's inner side, and thus not visible from the hall unless the door was open, would not transgress the association's old rules.

Before we go further, a few words are in order on the significance of the change that allows owners to fasten mezuzot to the hall side of the door frames. At oral argument counsel for the Blochs told us that the goal of this suit is prospective relief. That the association voluntarily adopted a religious exception to its rules would not make such a claim moot, for the board might abrogate the exception. See *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953). But state and local laws have made it impossible for the association to go back to the 2001 version. On December 14, 2005, Chicago enacted an ordinance that denies a residential building authority to prevent any owner or lessee "from placing or affixing a religious sign, symbol or relic on the door, door post or entrance of an individual apartment, condominium or cooperative housing unit" unless necessary to "avoid substantial damage to property or an undue hardship to other unit owners". Chicago Municipal Code 5-8-030. And

as of January 1, 2007, a state law, 765 ILCS 605/18.4(h), requires every condo association to establish a "reasonable accommodation for religious practices, including the attachment of religiously mandated objects to the front-door area of a condominium unit." So defendants cannot restore the rule to which plaintiffs object. This, coupled with counsel's statement at oral argument that plaintiffs' objective is an injunction, led us to ask for briefs on mootness. Plaintiffs' supplemental filing makes it clear that, despite what counsel said at argument, their main goal is damages (and, should they prevail, attorneys' fees). So the suit is not moot.

But it is unnecessary to consider whether a mezuzah on the residential side of a doorpost would meet the requirements of plaintiffs' faith. For the hallway rule, as adopted in 2001 and as enforced in 2004, is neutral with respect to religion. The rule says that no signs and no "objects of any sort" may be placed on the hallway side of doors and door frames. The association removed secular photos and posters as well as Christmas ornaments, crucifixes, and mezuzot. Generally applicable rules that do not refer to religion differ from discrimination. See, e.g., *Employment Division v. Smith*, 494 U.S. 872 (1990).

Plaintiffs do not contend that a seemingly neutral rule was adopted to target an unwanted group, after the fashion of *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993). The anti-sacrifice rule at issue in that case was irrelevant to most inhabitants of the town but effectively outlawed one unwelcome religious sect. The hallway rule of the Shoreline Towers Condominium Association, by contrast, potentially affects every owner. It bans photos of family vacations, political placards, for-sale notices, and Chicago Bears pennants. Lynne Bloch led the

committee that drafted this rule; she was not trying to undermine her own religious practices. The objection to this rule is not that it is designed to target a religion, but that it lacks a religious proviso. The rule was adopted not because of, but in spite of (or with indifference toward), the consequences that plaintiffs decry. Cf. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).

What the Blochs want is a religious exception to a neutral rule. That is to say, they seek an accommodation of religion, which is exactly how the state law that we have quoted expresses its requirements. The Fair Housing Act requires accommodation—but only of handicaps. See 42 U.S.C. §3604(f)(3)(B). Several federal statutes require accommodation of religion. Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(j), does so for employment, see *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977), the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc to 2000cc–5, does so for zoning and prisons, see *Cutter v. Wilkinson*, 544 U.S. 709 (2005), and the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb–4 does so for laws and practices of the federal government that substantially burden religion. See *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418 (2006). But none of these laws applies to regulations adopted by private condo associations.

Plaintiffs would like us to treat failure to make an accommodation as a form of discrimination. That was one theme of Justice O'Connor's separate opinion in *Smith*—but the majority held that a neutral, exception-free rule is not discriminatory and is compatible with the Constitution's free exercise clause. See also, e.g., *Boerne v. Flores*, 521 U.S.

507 (1997); *University of Alabama v. Garrett*, 531 U.S. 356 (2001). It would be especially inappropriate to adopt in the name of the Fair Housing Act a principle that lack of accommodation = discrimination, since the FHA itself distinguishes the two. By requiring accommodation of handicap but not race, sex, or religion, the statute's structure tells us that the FHA uses the word "discriminate" to mean something other than "failure to accommodate." We cannot create an accommodation requirement for religion (race, sex, and so on). Our job is not to make the law the best it can be, but to enforce the law actually enacted. See *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006).

Any requirement of religious accommodation creates occasions for conflict. An entitlement of one group to display its symbols may cause unease for other faiths that abhor all icons. Within the bounds set by the Constitution's establishment clause, a legislature may authorize or require religious accommodation in housing, as Illinois and Chicago have done. Deciding whether this is to be done, and if so how far the obligation extends—the Religious Land Use and Institutionalized Persons Act stops with land use and prisons—is a task for the legislature. The Fair Housing Act requires accommodation of handicaps but not religious beliefs and practices. No more need be said to establish that the judgment must be

AFFIRMED.

WOOD, *Circuit Judge*, dissenting. The central question in this case is whether the Shoreline Towers Condo Association Board and its president Edward Frischholz intentionally discriminated against plaintiffs Lynne, Helen, and Nathan Bloch in violation of the Fair Housing Act (FHA), 42 U.S.C. § 3601 *et seq.*, when the defendants abruptly decided to reinterpret a condo rule on the topic of hallway clutter to prohibit the Blochs from fulfilling their religious duty to place a small mezuzah on the outer frame of their door. My colleagues recharacterize the Blochs' claim as one seeking some kind of accommodation for a religious practice, and as so understood, they conclude that the district court was correct to grant summary judgment in favor of the defendants. It is at that crucial juncture that I part company with them. In my view, the Blochs are raising a straightforward claim of intentional discrimination based on their Jewish religion and ethnicity, and they are entitled to reach a trier of fact. I therefore dissent from the decision to affirm the district court's judgment.

## I

It is important at the outset to review exactly what this case is about. There is a helpful description of the mezuzah in the *amicus curiae* brief filed by the Decalogue Society of Lawyers in support of the Blochs' claim, which I set forth here for convenience:

> The mezuzah, which translates to "doorpost," consists of a small piece of parchment rolled up and placed into a small wooden, plastic, or metal casing. . . . They usually are no more than six inches long, one inch deep, and one inch wide. The parchment contains two biblical passages:

> Hear, O Israel: the Lord is our God, the Lord is the
> One and Only. You shall love the Lord, your God,
> with all your heart, with all your soul, and with all
> your resources. And these matters that I command
> you today shall be upon your heart . . . . And write
> them on the doorposts of your house and upon your
> gates.

*Deuteronomy* 6:4-9 (*The Torah*, The Artscroll
Series/Stone Ed., Mesorah Publ'n Ltd. 1996), and

> It will be that if you hearken to My commandments
> that I command you today, to love the Lord, your
> God, and to serve Him with all your heart and with
> all your soul . . . . You shall place these words of
> Mine upon your heart and upon your soul; . . . And
> you shall write them on the doorposts of your house
> and upon your gates . . . .

*Deuteronomy* 11:13-21 (*The Torah*, The Artscroll Se-
ries/Stone Ed., Mesorah Publ'n Ltd. 1996).

The mezuzah must be placed in a certain place, and many
observant Jews will touch it and then kiss their fingers
and pray as they enter and leave the home. (I attach a
picture of a mezuzah to this opinion, to show its general
size and placement.) At this stage of the litigation, no one
is disputing the fact that the mezuzah is a central part of
the Jewish religious tradition or the fact that the Blochs
genuinely believe that it is their religious duty to have a
mezuzah on their doorpost.

  Until 2004, the Blochs had their mezuzot posted on their
door posts in accordance with Jewish law, and no one
seems to have objected. As the majority notes, however, in
2004 the Association adopted the position that the Blochs'
mezuzot were inconsistent with a rule of the Association.

It is worth looking at the history of the dispute that ensued in some detail, as it explains why the Blochs believe that they have been the victims of intentional discrimination. Because this case comes to us after a grant of summary judgment, I present the facts in the light most favorable to the Blochs.

The Blochs have lived for more than 30 years in three units at Shoreline Towers, a condominium building located on Chicago's North Side. Lynne Bloch, the mother of Helen and Nathan Bloch, has served on the condominium board for over 15 years. In 2001, while she was on the board, the rules and regulations committee revised the rules and enacted the so-called Hallway Rule, which reads as follows in its entirety:

*Hallways*

1. Mats, boots, shoes, carts or objects of any sort are prohibited outside Unit entrance doors.

2. Signs or name plates must not be placed on Unit doors.

3. Pets must not be left unattended in the hall. Hallways should not be used as dog/pet runs.

4. No alterations to the common area hallways are allowed.

5. No playing with or riding of bicycles, tricycles, roller blades, etc. is allowed.

Hallway Rule 1 is the section at issue here. Until the spring of 2004, no one interpreted the rule as forbidding the placement of mezuzot on the exterior doorposts of unit entrances.

In May 2004, the defendants began a project to renovate the hallways in the building; this project included the

repainting of all walls and doors. They instructed the residents to remove all objects from their doors in preparation for the work. The Blochs removed their mezuzot in compliance with this request, but after the work was completed, they re-affixed the mezuzot to the exterior doorposts of their unit entrances. It was only then that defendants began removing and confiscating the mezuzot, without notice to the Blochs and without their permission. The defendants claimed that they were enforcing Hallway Rule 1, even though the rule had never before been applied in that way. It had instead been applied as a rule ensuring that clutter did not accumulate around the doors of units; Hallway Rule 2 was the only rule addressing items affixed to doors, and it obviously prohibited only signs or name plates, not mezuzot. The Blochs objected and furnished information to the condominium association explaining the religious signficance of the mezuzah. Their efforts were unavailing: between May 2004 and September 2005, the building maintenance staff repeatedly confiscated the Blochs' mezuzot. At one point, the Blochs were told that if they put up a mezuzah again, they would be fined.

Perhaps the worst episode, and one that gives rise to a strong inference of anti-Semitic animus, occurred while the Blochs were mourning the death of Dr. Marvin Bloch, Lynne's husband and Helen and Nathan's father. In preparation for Shiva, the seven-day mourning period specified by Jewish law, see http://www.aish.com/literacy/lifecycle/the_Stages_of_Jewish_Mourning.asp (visited June 23, 2008), the Blochs' attorney wrote a letter to the condo board requesting that their mezuzah be allowed to remain during the Shiva. In the letter, the attorney referred to an agreement between the Blochs and the condo

that would have permitted this limited display. Rather than complying with their request, however, the defendants waited until the family literally was attending Dr. Bloch's funeral and then removed the mezuzot while everyone was away. When the Blochs returned home with the funeral guests, including a rabbi, they were horrified to discover that the mezuzot were once again missing.

Another resident of Shoreline Towers, Debra Gassman, was also an observant Jew who described how "her life was turned upside down one fateful summer evening" when "she returned home to her Chicago condominium to find her mezuza [*sic*] missing from the doorpost." See Ruth Eglash, *The Case of the Confiscated Mezuzah*, The Jerusalem Post, June 8, 2006. Gassman, who also sued the same defendants, see *Gassman v. Frischolz* et al., No. 05 C 5377 (N.D. Ill.), on appeal, No. 07-2213 (7th Cir.), first thought that she had been the victim of a hate crime. Stunned to find out that the mezuzah had been lifted at the orders of the condominium board itself, Gassman concluded that she had essentially been evicted from her home. In December 2005, she made aliyah (returning to make Israel her home, see http://www.aliyah.org (visited June 23, 2008)), but continued to pursue her lawsuit. (Proceedings in this court have been suspended pending the outcome of the Blochs' case.)

In September 2004, Lynne offered a proposal to the condo board to amend Hallway Rule 1 to specify that mezuzot could be posted on the exterior doorframes of unit entrances. The board refused. As a result of several later developments, most of which occurred while this litigation was pending, the case is now solely one for money damages, as my colleagues note. After the district

court ordered the adoption of an amended hallway rule pending the litigation, the City of Chicago amended its code to prohibit:

> interfere[nce] with the religious observances or practices of any lessee or condominium or cooperative unit owner, by restricting or prohibiting such persons from placing or affixing a religious sign, symbol or relic on the door, door post or entrance of an individual apartment, condominium or cooperative housing unit owned or leased by such person . . . .

Municipal Code of Chicago, § 5-8-030 (enacted December 14, 2005). To similar effect, the General Assembly of Illinois enacted a new law amending the Condominum Property Act, so that it now specifies that:

> no rule or regulation may impair any rights guaranteed by the First Amendment to the Constitution of the United States or Section 4 of Article I of the Illinois Constitution including, but not limited to, the free exercise of religion, nor may any rules or regulations conflict with the provisions of this Act or the condominium instruments. No rule or regulation shall prohibit any reasonable accommodation for religious practices, including the attachment of religiously mandated objects to the front-door area of a condominium unit.

765 ILCS 605/18.4(h) (effective January 1, 2007).

At oral argument, the panel requested supplemental briefs discussing the question whether these new laws rendered the Blochs' case moot. Our concerns were heightened by the impression that the Blochs' lawyer left with us that the case was *only* about injunctive relief. A close look at the pleadings, however, reveals that this is not so. Both

in the papers filed with the district court and those filed here, the Blochs have maintained all along that they are seeking damages for the pain, humiliation, and distress they suffered during the long period of contention. I therefore agree with the majority that the request for damages is enough to save the case from mootness. I feel compelled to add that there is nothing either surprising or wrong (contrary to many statements in the defendants' supplemental brief) about the fact that the Blochs initially sought both kinds of relief. Indeed, especially given the fact that the question in this case is whether a trier of fact could conclude that the defendants were intentionally discriminating against the Blochs, it was shocking to read at the end of their supplemental brief that "[t]hroughout this matter, Plaintiffs have been trying to get their 'pound of flesh' from Defendants due to personal animosity between Lynne and Frischholz." Perhaps the defendants have not read Shakespeare's *Merchant of Venice* lately and thus failed to recall that the play is about a bitter Jewish moneylender, Shylock, who agreed to loan funds to a man he loathed (Antonio—who spit on him because he was Jewish) only upon a promise that if the loan was not paid in time, Shylock would be entitled to carve a pound of flesh from Antonio. At the end of the play, after the disguised Portia defeats the contract by pointing out that Shylock is not entitled to shed any blood while he takes his pound of flesh, Shylock is punished by losing half of his lands and being forced to convert to Christianity. This is hardly the reference someone should choose who is trying to show that the stand-off about Hallway Rule 1 was not *because of* the Blochs' religion, but rather *in spite of* it. See *ante* at 5, citing *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).

## II

The Blochs are pursuing on appeal four legal theories in support of their claim to relief. (They also raised supplemental state-law arguments, but the district court declined to exercise its supplemental jurisdiction under 28 U.S.C. § 1367 after it dismissed the federal-law theories. If we were remanding this case, as I believe we should be, those state-law counts should be reinstated as well. I do not discuss them further here.) Three of the federal theories rest on the Fair Housing Act (FHA), §§ 3604(a), 3604(b), and 3617; one relies on the Civil Rights Act, 42 U.S.C. § 1982. I begin with the FHA theories.

Section 3604(a) makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." Section 3604(b) then makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." Finally, § 3617 makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." The primary authority from this court construing §§ 3604 and 3617 is *Halprin v. The Prairie Single Family Homes of Dearborn Park Ass'n,* 388 F.3d 327 (7th Cir. 2004).

*Halprin* was another case that involved discrimination on the basis of a homeowner's Jewish religion and ethnic-

ity. Plaintiff Halprin complained that the president of his homeowners' association wrote anti-Semitic graffiti on a wall of his property and committed other acts of vandalism and harassment. The president also thwarted Halprin's efforts to complain at the board meetings. Although, as the majority notes in its discussion of *Halprin,* we commented that § 3604 "indicates concern with activities, such as redlining, that prevent people from acquiring property," 388 F.3d at 328, the opinion did not stop there. As a purely semantic matter (not a bad way to construe a statute), we acknowledged that "the statutory language might be stretched far enough to reach a case of 'constructive eviction.'" *Id.* at 329. In general, we concluded, § 3604 is concerned with access to housing. Like the Blochs, the plaintiffs in *Halprin* also raised a claim under § 3617, as implemented by a regulation from the Department of Housing and Urban Development (HUD), 24 C.F.R. § 100.400(c)(2). The regulation says, in pertinent part, that "[c]onduct made unlawful under this section includes, but is not limited to . . . [t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons." *Halprin* notes a tension between this regulation and the language of § 3617, since § 3617 seems to cover only interference with rights secured by other provisions of the FHA, and § 3604 (according to *Halprin*) extends only to claims related to access. In the *Halprin* case itself, the court did not pursue that tension further because it found that this point was forfeited, and so it simply remanded the case to the district court for further proceedings on the claim relying on the HUD regulation. See also *East-Miller v. Lake County Highway Dep't,* 421 F.3d 558, 562-64 (7th Cir. 2005).

Given the language in *Halprin* reserving the question whether the HUD regulation creates an independent right to be free from interference on the basis of religion during the period of occupancy, I approach § 3604(a) as if it is limited to cases in which availability or access to housing is at issue. Even under that narrow view, the Blochs should be permitted to go forward with their case. The record contains substantial evidence that the inability to place a mezuzah on the doorpost creates a constructive eviction for observant Jewish residents. There are letters from the Rabbinical Council of Chicago, the Decalogue Society, and Rabbi Aron Wolf, who heads up the Mezuzah Division of the Chicago Mitzvah Campaign (see http://www.chicagomitzvahcampaign.com/mezuzah.htm (last visited June 24, 2008)). All of these witnesses stated that an observant Jew would be forced to move if he or she was not allowed to affix a mezuzah. The only reason the Blochs have not moved is because an interim rule was adopted, and then reinforced by an order from the district court, allowing them to maintain their mezuzot during the pendency of this suit. Going forward, the new Chicago ordinance and Illinois law provide further protection for them. But Debra Gassman did move because of the way that Hallway Rule 1 was enforced. Thus, in a real sense, Hallway Rule 1 makes condominium units at Shoreline Towers functionally unavailable to observant Jews like the Blochs and, if it could be enforced, the rule would effect their constructive eviction. They are faced with a dilemma: a choice between observing their religion as they believe the Torah commands them to do and living in Shoreline Towers. Moreover, Hallway Rule 1 operates exactly as a redlining rule does with respect to the ability of the owner to sell to observant Jews. No such person could buy a unit at

Shoreline Towers. The Association might as well hang a sign outside saying "No observant Jews allowed." From that point of view, the rule falls squarely within the ambit of § 3604(a), as construed in *Halprin.*

The Blochs' case is also secure under the terms of § 3604(b), which focuses on discrimination against any person in "the terms, conditions, or privileges of sale or rental of a dwelling" on the ground, among other things, of religion. (The defendants claim that the Blochs waived this argument, but I do not read the record so narrowly. First, there certainly is no express renunciation of any such ground of recovery, and so the worst one could say is that they forfeited the argument. Even that does not square with the record: the Blochs did make allegations of discrimination in connection with § 3604(b), and that is enough in my view.) The language of § 3604(b) is broad, referring to any "terms, conditions, or privileges of sale." Although it may be possible to interpret these words restrictively to cover only pre-sale activities, nothing in the statute compels such an interpretation. Tellingly, HUD, which is the agency responsible for developing regulations that implement the FHA, has adopted a broader approach. HUD's regulation extends the protections of § 3604(b) to "an owner, tenant or a person associated with him or her." 24 C.F.R. § 100.65(b)(4). This was a formal regulation of the type that is entitled to deference under *Chevron, USA v. Natural Resources Defense Council,* 467 U.S. 837 (1984), assuming *Chevron*'s criteria are met.

The first step under *Chevron* is to ask whether Congress spoke clearly to the issue at hand. Although the Association argues that § 3604(b) is unambiguous, and can be read only to apply to pre-acquisition acts, the Blochs point out that one of the most obvious "privileges" of the purchase

of property is the right to live in it without being plagued by discrimination. At least one district court judge has taken the Blochs' side, suggesting that this is a view that a reasonable person may hold. See *United States v. Koch*, 352 F. Supp. 2d 970, 976-77 (D. Neb. 2004). Contrary to the Association's position, *Halprin* does not dispose of this point; it did not focus specifically on § 3604(b), and inso-far as it dealt with regulations, it reserved for another day a more detailed examination. Granting, then, that § 3604(b) is ambiguous, we turn to *Chevron*'s second step, under which we decide whether HUD's interpretation of the statute is reasonable. HUD's approach is consistent with the "generous construction" that the Supreme Court gave to the statute in *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 212 (1972), and it is the one that will ensure that members of protected groups do not win the battle (to purchase or rent housing) but lose the war (to live in their new home free from invidious discrimination). I would find, for these reasons, that 24 C.F.R. § 100.65(b)(4) is a valid interpretation of § 3604(b), and that the only remaining question for this part of the case is whether the Blochs have presented enough evidence of discrimina-tion or harassment based on the fact that they are Jewish to survive summary judgment.

In this connection, the evidence of constructive evic-tion, diminished opportunity to sell to prospective Jewish purchasers, and harassment (including the cruel funeral incident) is just as useful for this theory as it was for § 3604(a). The Association's argument that its actions against the Blochs' mezuzot were isolated and innocuous incidents is only a characterization of the facts that a jury might accept, but that it might equally reject. There was nothing "isolated" about its actions: once it decided

to reinterpret Hallway Rule 1 to address items on the doorpost as well as "mats, boots, shoes, carts or objects of any sort" placed on the floor of the hallway near the door, Association personnel consistently removed the mezuzot, despite the Blochs' protests and Lynne's efforts to get the rule changed or at least briefly suspended during Shiva. Nor, as I discuss in a moment, would a trier of fact be compelled to find that the Association's actions were "innocuous" as opposed to intentionally discriminatory.

The central reason why the majority has rejected the Blochs' claim is its conclusion that they are seeking some kind of special religious accommodation to a facially neutral rule, and that there is nothing in this record that could support a finding that the Association's actions amounted to intentional discrimination against Jews. That position is relevant to each of the three sections of the FHA on which the Blochs rely: §§ 3604(a) and (b), which I have already discussed, and 3617, which makes it unlawful to interfere with, intimidate, etc., any person in the exercise of rights secured elsewhere in the FHA. It is possible, as *Halprin* acknowledged, that § 3617 and its implementing regulation, 24 C.F.R. § 100.400(c)(2), support a free-standing claim under the statute. Even if it does not, however, I have explained why I would find that rights secured by § 3604 are at stake in this case.

The majority's assumption that this case is really about accommodation is possible only if we improperly resolve a disputed factual question against the Blochs on summary judgment. Whether Hallway Rule 1 is supposed to include mezuzot is both a material question and one that is fairly in dispute: both sides have marshaled reasonable arguments for and against the proposition, using com-

mon canons of construction. The majority takes this argument as concluded and characterizes Hallway Rule 1 as a facially neutral rule that includes mezuzot to which the Blochs are seeking an exception. This record, however, is not so unequivocal that either we or the district court can decide such a pivotal factual issue on summary judgment.

The majority contends, *ante* at 4, that the Blochs are not arguing that a seemingly neutral rule was adopted to target an unwanted group, as was the case in *Church of Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520 (1993). With respect, and with one minor qualification, I cannot agree. It is true that the original five-part Hallway Rule, which was adopted in 2001 while Lynne Bloch was on the condominium association's board, was not adopted at that time for this impermissible purpose. The whole point of the Blochs' case, however, is that the Association, under the guise of "interpreting" the rule in 2004, transformed it from a neutral one to one that was targeted exclusively at observant Jewish residents. Just as the sacrifices proscribed by the ordinance in *Lukumi* were irrelevant to most inhabitants of the town but a vital part of the Santería religion, so the placing of an object on the doorpost is (as far as anything in this record shows) irrelevant to practitioners of Christianity, Islam, Buddhism, Hinduism, or any other religion, but it is a duty (a mitzvah) for Jews.

The majority argues that Hallway Rule 1 is neutral because it applied not only to mezuzot but also to a wide variety of secular objects (photographs and posters) and objects associated with other religions (crucifixes, Christmas ornaments, and the like). Undoubtedly they are relying on the rule announced in *Employment Division v. Smith,* 494 U.S. 872 (1990), to the effect that the Free Exer-

cise Clause of the First Amendment is not violated by a neutral state law that is not specifically directed at the practitioners of a particular religion and is constitutional as applied to others. But they are overlooking the qualifications the Court noted to *Smith*'s rule. The Court cautioned that there was "no contention that Oregon's drug law represents an attempt to regulate religious beliefs, the communication of religious beliefs, or the raising of one's children in those beliefs . . . ." *Id.* at 882. These qualifications came to the fore in *Lukumi*. Justice Kennedy's opinion for the plurality discussed *Smith* at length and explained why it did not control in *Lukumi*, while the concurring opinion of Justice Scalia (the author of *Smith*) agreed that the laws enacted by the city council in *Lukumi* were "laws which, though neutral in their terms, through their design, construction, or enforcement target the practices of a particular religion for discriminatory treatment." 508 U.S. at 557. In my view, Justice Scalia's language aptly describes Hallway Rule 1. To the extent that the facts pertaining to the "design, construction, or enforcement" of the law are in dispute, we must of course view them in the light most favorable to the Blochs.

It is thus neither helpful nor accurate to say that the reinterpreted, 2004, version of Hallway Rule 1 is "neutral" and that the Jewish residents are seeking a special accommodation. The Hallway Rule falls outside of *Smith* because it is not neutral once it is examined beyond its face. Other methods of enforcing the Rule—such as the regime that pertained up until 2004—would achieve the same end without burdening legitimate religious interests. Indeed, the direct regulation of materials on the fronts of doors sufficed until 2004. *Lukumi* recognized, in the context of the First Amendment, that "[f]acial neutrality is

not determinative. The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The Clause 'forbids subtle departures from neutrality' . . . and 'covert suppression of particular religious beliefs.' " 508 U.S. at 534 (citations omitted). A trier of fact could find that Hallway Rule 1 was immaterial to all other residents, and that its sole force and purpose was to discriminate against the Jewish owners. One could say the same thing about a rule forbidding women to wear headscarves in the common areas of the condominium: no one but observant Islamic women would be under a religious duty to do so, and so there would be a fair inference that such a rule intentionally discriminates against persons of one religion even though it appears facially neutral.

**III**

The Blochs also relied on 42 U.S.C. § 1982, which provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." The Supreme Court has held that "Jews are not foreclosed from stating a cause of action [under § 1982] against other members of what today is considered to be part of the Caucasian race." *Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 618 (1987). That said, there is nothing in § 1982 that would call for a different result than the Blochs would achieve under the FHA. They must prove intentional discrimination either way, and so the right to relief under § 1982 rises or falls with the FHA theories.

In my view, the Blochs presented ample evidence to support the denial of the Association's motion for sum-

mary judgment. Their theory under the FHA is a sound one, and their evidence would support a finding of intentional discrimination by the finder of fact. I would therefore reverse and remand for further proceedings.

Picture of a Mezuzah

Source: Google Images

