In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-3376

LYNNE BLOCH, HELEN BLOCH and NATHAN BLOCH,

*Plaintiffs-Appellants*,

*v.*

EDWARD FRISCHHOLZ and SHORELINE TOWERS
CONDOMINIUM ASSOCIATION,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 5379—**George W. Lindberg**, *Judge.*

ARGUED MAY 13, 2009—DECIDED NOVEMBER 13, 2009

Before EASTERBROOK, *Chief Judge*, and BAUER, POSNER,
KANNE, WOOD, EVANS, SYKES, and TINDER, *Circuit Judges*.*

TINDER, *Circuit Judge*. In this case, we consider whether
condominium owners can sue their condo association
under the Fair Housing Act (FHA), 42 U.S.C. §§ 3601 *et seq.*,

---

* Circuit Judges Flaum, Rovner, and Williams took no part
in the consideration of this case.

for alleged religious and racial discrimination that took place after the owners bought their condo unit. We highlight the word "after" because based on a prior opinion from this court, *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327 (7th Cir. 2004), the district court concluded that condo owners couldn't rely on the FHA to safeguard their rights from any post-acquisition discrimination. We took this case to the full court to consider this important question. Upon careful review of the FHA and our prior opinion in *Halprin*, we conclude that in some circumstances homeowners have an FHA cause of action for discrimination that occurred after they moved in. On the facts of this case, we conclude that Lynne, Helen, and Nathan Bloch have offered enough evidence to allow a trier of fact to decide whether they suffered intentional discrimination at the hands of the Shoreline Towers Condo Association and its president Edward Frischholz. We therefore reverse the summary judgment granted against the Blochs.

## I.  The Mezuzah Dispute

At the center of this case is a little rectangular box, about six inches tall, one inch wide, and one inch deep, which houses a small scroll of parchment inscribed with passages from the Torah, the holiest of texts in Judaism.[1] The scroll is called a mezuzah (or in the plural form,

---

[1]  The inscribed passages from the Torah are *Deuteronomy* 6:4-9, 11:13-21, translated in English in The Five Books of Moses  912-13, 937 (Robert Alter trans., 2004).

mezuzot or mezuzoh). Though small in size, the mezuzah is a cental aspect of the Jewish religious tradition—many Jews believe they are commanded by God to affix mezuzot on the exterior doorposts of their dwelling (specifically, on the right doorpost when facing into the home, one-third of the way down from the top of the doorway, within about three inches of the doorway opening). Many Jews touch and kiss the mezuzah and pray when entering a home with a mezuzah on the doorpost.[2]

The Blochs, long-time residents of three units in the Shoreline Towers condominium building, are Jewish. As residents, the Blochs are subject to the rules and regulations enacted by the Condo Association's Board of Managers. For approximately three decades, the Blochs displayed mezuzot on the doorposts outside of their condo units without objection.

In 2001, the Association's rules and regulations committee enacted a set of rules to govern certain activities taking place outside the units in the common hallways. Lynne chaired that committee at that time and voted in favor of the rules. The "Hallway Rules," as they have come to be called, stated:

*Hallways*

> 1.  Mats, boots, shoes, carts or objects of any sort are prohibited outside Unit entrance doors.

---

[2] For a discussion of the mezuzah and its role in Judaism, see THE OXFORD DICTIONARY OF THE JEWISH RELIGION 460-61 (1997) (R. J. Zwi Werblowsky & Geoffrey Wigoder eds., 1997).

2. Signs or name plates must not be placed on Unit doors.

3. Pets must not be left unattended in the hall. Hallways should not be used as dog/pet runs.

4. No alterations to the common area hallways are allowed.

5. No playing with or riding of bicycles, tricycles, roller blades, etc. is allowed.

We're most concerned with Hallway Rule 1. From the Rules' enactment until mid-2004, the Association did not remove mezuzot or any other object affixed to the outside of unit doors or doorposts, with the exception of a few pictures, depicting a swastika, a marijuana plant, and the Playboy bunny. Instead, the Association ordinarily relied on Rule 1 to remove clutter from the hallways.

In May 2004, the Association began renovating the building's hallways and repainted the walls and doors. The Association asked residents to remove everything from their doors to prepare for the work. The Blochs obliged and took down their mezuzot. When the work was finished, they put their mezuzot back up. But then, without notice to the Blochs, the Association began removing and confiscating the mezuzot. The Association said that mezuzot on doorposts violated Hallway Rule 1, because "objects of any sort" included mezuzot. It included more than that, though, as the Association also confiscated crucifixes, wreaths, Christmas ornaments, political posters, and Chicago Bears pennants.

The Blochs voiced their concerns to the Association and provided the Association with information explaining the religious significance of the mezuzah. For example, a letter from the Chicago Rabbinical Council explained that Jewish law requires mezuzot to be displayed on the exterior doorpost, rather than indoors. Another letter explained that observant Jews could not live in a place that prohibited them from affixing mezuzot to their doorposts. But the Blochs received no relief from Frischholz or the Association. Though Frischholz knew as early as 2001 that removing mezuzot would be a problem for Lynne Bloch, he made no effort to stop the staff from repeatedly tearing them down. Instead, he accused Lynne of being a racist, called her a liar, encouraged other tenants to vote against her re-election to the Association's Board of Managers, and told her that if she didn't like the way the rules were enforced, she should "get out." He also admitted in his deposition that, when Lynne was on the Board, he held Board events on Friday evenings, despite knowing that Lynne could not attend due to her religious obligations. When asked about whether he was aware of those obligations, he answered affirmatively, stating, "She's perfectly able. She decides not to. . . . She says that she can't attend after sunset, because it is Shavus [sic]."[3] He

---

[3] Though transcribed as "Shavus," Frischholz probably was referring to "Shabbat" or "Sabbath," which is the "weekly day of rest observed from sunset on Friday until nightfall on
(continued...)

was well aware of Lynne's fidelity to Judaic religious practices.

As for the Board, it rejected a formal proposal by the Blochs to change the Rules. The Association went on to warn the Blochs that they would be fined if they continued to display their mezuzot. So for over a year, each time the Blochs put their mezuzot back up, the Association took them down. We also know that the mezuzah of at least one other Jew, Debra Gassman, was removed pursuant to the reinterpretation of Rule 1.

The mezuzah removals persisted even during the funeral of Marvin Bloch, Lynne's husband and Helen and Nathan's father, despite the Blochs' request that the mezuzot be left up for the seven-day Shivah, the Jewish period of mourning.[4] Frischholz had agreed to allow the mezuzah to stay up during Shivah. The Association also provided a coat rack and a card table, both of which were placed in the hall outside the Blochs' condo unit. A jug of water was placed on the table so visitors could wash their hands when returning from the cemetery. Upon their return from the burial, though, the Blochs and their guests, including a rabbi, were shocked to find the doorpost empty once again. The Blochs were humili-

---

[3] (...continued)

Saturday," THE OXFORD DICTIONARY OF THE JEWISH RELIGION, *supra*, at 595; *see also id.* at 624 (defining "Shabbat").

[4] For a discussion of Shivah, see THE OXFORD DICTIONARY OF THE JEWISH RELIGION, *supra*, at 638.

ated having to explain to the rabbi why, on the day of the funeral, their mezuzah was not on the doorpost. The coat rack and the table, however, were still sitting in the hallway. The Blochs reaffixed the mezuzah after retrieving it from the management office. But on three more occasions during the week-long Shivah, the Blochs were interrupted in their mourning as they confronted the Shoreline Towers maintenance staff who came to again take down their mezuzah. (Of course, we don't vouch for the veracity of these facts and the inferences that can be drawn from them, but we must accept the facts as true and construe reasonable inferences in the Blochs' favor at this stage in the proceedings.)

On September 16, 2005, the Blochs filed this lawsuit, seeking an injunction and damages for distress, humiliation, and embarrassment. A magistrate judge entered an order prohibiting the defendants from removing the Blochs' mezuzot, consistent with a rule change the Board of Managers was considering. Shortly thereafter, the Board ratified the change, which created an exception to Hallway Rule 1 for religious objects. In the coming months, the City of Chicago would amend its code to proscribe in condos and rental properties restrictions on affixing religious signs or symbols to doorposts. See Chi., Ill., Municipal Code, § 5-8-030(H). Soon thereafter, the Illinois legislature followed suit. See 765 ILCS 605/18.4(h). These legislative changes mooted the Blochs' claim for an injunction, but their claim for damages remains alive.

## II.  The Proceedings Leading to Rehearing En Banc

The Blochs sought relief on both federal and state grounds. On the federal side, the Blochs asserted three theories based on the FHA, 42 U.S.C. §§ 3604(a), 3604(b), and 3617; and one on the Civil Rights Act, 42 U.S.C. § 1982. The district court, however, granted summary judgment for the defendants on each federal theory. The court concluded that our decision in *Halprin* precluded FHA claims under § 3604(a) and (b) for discrimination that occurred while the Blochs owned their condo unit, because *Halprin* said the FHA prohibited discrimination only at the time of sale. The district court also found that the record failed to show that the defendants harbored any discriminatory animus based on religion or race toward the Blochs. Since §§ 3617 and 1982 require proof of discriminatory intent, the court found these claims meritless as well. Finally, without any federal claims left, the district court declined to exercise supplemental jurisdiction over the Blochs' state-law claims.

The Blochs appealed to this court and the panel affirmed over a dissent. *Bloch v. Frischholz*, 533 F.3d 562 (7th Cir. 2008). The majority agreed with the district court that the Blochs failed to present sufficient evidence of intentional discrimination to survive summary judgment. In the majority's view, the Hallway Rules were neutrally adopted and enforced, so the Blochs merely sought a religious accommodation. *Id.* at 565. Though the FHA permits accommodations for disabilities, it is silent as to religious accommodations. *Id.* Because we cannot create what Congress left out, the majority concluded the

Blochs' discrimination claims must fail, regardless of the theory. *Id.*

The dissent, on the other hand, didn't see a request for accommodation but rather a straightforward claim for intentional discrimination. *Id.* at 572-73 (Wood, J., dissenting). The dissent examined the statute and found that the Blochs could maintain a claim for post-sale discrimination under the FHA; *Halprin* left enough room for the Blochs to rely on § 3604(a) and (b). *Id.* at 570-71. Concluding that the FHA could give the Blochs a cause of action, the dissent went on to argue that, based on the record, it does. The dissent contended that the majority prematurely characterized the Blochs' claim as one for an exception to the supposedly neutral Hallway Rules. Whether Hallway Rule 1 reached mezuzot at all, the dissent argued, was a disputed material issue of fact. Moreover, the dissent found that the Blochs marshaled sufficient facts to show that the Association's "reinterpretation" of the Hallway Rule in 2004 to include mezuzot was intentionally discriminatory. In other words, though Hallway Rule 1's text was facially neutral, the record contained evidence that the defendants' enforcement of it was done with discriminatory animus, allowing the Blochs to proceed to trial. *Id.* at 572-73.

### III.  The Fair Housing Act

This case presents essentially two questions. First, under which federal theories, if any, can the Blochs seek relief? We focus exclusively on the three FHA provisions to

determine whether any of them supports a claim for post-sale discrimination.[5] Second, did the Blochs offer sufficient evidence of discrimination to proceed to trial on one or more of their federal theories?

We begin with the FHA. The Blochs argue they can sustain independent claims under all three provisions, 42 U.S.C. §§ 3604(a), 3604(b), and 3617. The defendants, by contrast, contend that none of these statutes provides the Blochs an avenue for relief because the FHA, with respect to condo owners, is addressed only to discrimination that takes place in the sale of housing. They assert that the FHA's protections are left on the doorstep as owners enter their new homes. We examine each of the three theories in turn.

---

[5] We don't need to discuss the Blochs' § 1982 claim separately, because that claim, like the FHA claims, will survive only if the record demonstrates triable issues of fact on intentional discrimination. *See Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996). The parties do not dispute the legal underpinnings of the § 1982 theory, *see Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617-18 (1987) (holding that Jews can sue for race discrimination under § 1982), but only whether there are sufficient facts to support it. We will return to discuss the intentional discrimination concept and the relevant facts in part IV, *infra*.

Section 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982.

## A.  42 U.S.C. § 3604(a)

Section 3604(a) makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." The issue is whether this text prohibits any form of discrimination *after* the buyer or renter signs on the dotted line. (We recognize that the plaintiffs in this case are owners rather than renters, but there is no reason that there would be a distinction under the relevant provisions of the FHA.) Our opinion in *Halprin* left little room for a post-acquisition discrimination claim. *Halprin* also involved allegations of anti-Semitic harassment; members of the homeowners' association allegedly graffitied and vandalized the plaintiff's property and thwarted the plaintiff's attempts to investigate this conduct. 388 F.3d at 328. This harassment did not give rise to an FHA claim, we concluded in *Halprin*, because the FHA by and large concerned only "*access* to housing." *Id.* at 329 (emphasis in original).

Nonetheless, *Halprin* noted that "[a]s a purely semantic matter the statutory language might be stretched far enough to reach a case of 'constructive eviction.' " *Id.* That statutory language is the "otherwise make unavailable or deny" part, which is not tethered to the words "sale or rental" that constrain the other two § 3604(a) clauses. Availability of housing is at the heart of § 3604(a). "Section 3604(a) is designed to ensure that no one is denied the right to live where they choose for discriminatory rea-

sons." *Southend Neighborhood Improvement Ass'n v. County of St. Clair*, 743 F.2d 1207, 1210 (7th Cir. 1984). There could be situations where a person is denied that right after he or she moves in. Prohibiting discrimination at the point of sale or rental but not at the moment of eviction would only go halfway toward ensuring availability of housing. A landlord would be required to rent to an African-American but then, the day after he moves in, could change all the locks and put up signs that said, "No blacks allowed." That clearly could not be what Congress had in mind when it sought to create "truly integrated and balanced living patterns*." Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972) (quotation omitted). So we agree with *Halprin* that § 3604(a) may reach post-acquisition discriminatory conduct that makes a dwelling unavailable to the owner or tenant, somewhat like a constructive eviction. *See Evans v. Tubbe*, 657 F.2d 661, 662-63 & n.3 (5th Cir. Unit A Sept. 1981) (concluding that defendant's depriving plaintiff-landowner access to already-owned property on account of race arguably violated § 3604(a)).

The question here is whether the defendants have made the Blochs' units "unavailable" because of their religion (or their race). Proving constructive eviction is a tall order, but it's the best analogy the Blochs give to support their argument. Ordinarily, the plaintiff in such a case must show her residence is "unfit for occupancy," often to the point that she is "compelled to leave." BLACK'S LAW DICTIONARY 594 (8th ed. 2004). Plaintiffs must show more than a mere diminution in property values, *see*

*Southend Neighborhood*, 743 F.2d at 1210; *Cox v. City of Dallas, Tex.*, 430 F.3d 734, 742-43 & n.21 (7th Cir. 2005), more than just that their properties would be less desirable to a certain group, *see Tenafly Eruv Ass'n v. Tenafly*, 309 F.3d 144, 157 n.13 (3d Cir. 2002). Even in *Halprin*, the allegations of the defendants' blatantly discriminatory acts, including spraying the plaintiff's yard with harmful chemicals, were insufficient to give rise to a § 3604(a) claim. Availability, not simply habitability, is the right that § 3604(a) protects. *See Southend Neighborhood*, 743 F.2d at 1210 ("[Section 3604(a)] does not protect the intangible interests in the already-owned property raised by the plaintiffs [sic] allegations."); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 192 (4th Cir. 1999) (rejecting plaintiff's claim that selection of site for new highway construction violated § 3604(a) because plaintiff failed to allege that "anyone has for discriminatory reasons been evicted from his home or denied the right to purchase or rent housing"); *Clifton Terrace Assocs., Ltd. v. United Techs. Corp.*, 929 F.2d 714, 719 (D.C. Cir. 1991) ("A lack of elevator service is a matter of habitability, not availability, and does not fall within the terms of these subsections.").

Still, despite the analogy to constructive eviction, nothing in § 3604(a) suggests that "unavailability" refers only to the physical condition of the premises. "[C]ourts have construed the phrase 'otherwise make unavailable or deny' in subsection (a) to encompass mortgage 'redlining,' insurance redlining, racial steering, exclusionary zoning decisions, and other actions by individuals or

governmental units which directly affect the availability of housing to minorities." *Southend Neighborhood*, 743 F.2d at 1209 & n.3 (citing cases). In other words, the defendant need not burn the plaintiff's house down for the plaintiff to have an FHA claim. A defendant can engage in post-sale practices tantamount to "redlining" that make a plaintiff's dwelling "unavailable."

The Blochs argue that the defendants' reinterpretation of Hallway Rule 1 rendered Shoreline Towers unavailable to them and other observant Jews because their religion requires that they be able to affix mezuzot to their doorposts. Letters from the Mezuzah Division of Chicago Mitzvah Campaigns, the Rabbinical Council of Chicago, and the Decalogue Society of Lawyers state that Jewish law requires observant Jews to place mezuzot on the exterior of their entrance doorposts. One went so far as to explain that, "A Jew who is not permitted to affix mezuzohs as aforesaid to all of the doorposts of his dwelling would therefore be required by Jewish Law not to live there." We think this evidence is sufficient to establish a dispute about whether Shoreline Towers was unavailable to observant Jews.

But was it ever unavailable *to the Blochs*? Though our interpretation of unavailability under the FHA is undoubtedly a matter of federal law, an analogy to the common law property concept of constructive eviction is useful. The defendants argue that the Blochs were never evicted, actually or constructively, because they never vacated the premises. The defendants' point is well-taken. To establish a claim for constructive eviction, a

tenant need not move out the minute the landlord's conduct begins to render the dwelling uninhabitable—in this case, when the defendants began enforcing the Hallway Rule to take down the Blochs' mezuzot. Tenants have a reasonable time to vacate the premises. *Auto. Supply Co. v. Scene-in-Action Corp.*, 340 Ill. 196, 203 (1930); *see also Shaker & Assocs., Inc. v. Med. Techs. Group, Ltd.*, 733 N.E.2d 865, 873 (Ill. App. Ct. 2000). Nonetheless, it is well-understood that constructive eviction requires surrender of possession by the tenant. *E.g.*, *Infinity Broad. Corp. of Ill. v. Prudential Ins. Co. of Am.*, 869 F.2d 1073, 1077-78 (7th Cir. 1989) (citing cases); RESTATEMENT (SECOND) OF PROP.: LANDLORD & TENANT §§ 5.4, 10.1 cmt. e (1977); *Auto. Supply Co.*, 340 Ill. at 201; *Shaker & Assocs.*, 733 N.E.2d at 872; *JMB Props. Urban Co. v. Paolucci*, 604 N.E.2d 967, 969 (Ill. App. Ct. 1992); *Sigsbee v. Swathwood*, 419 N.E.2d 789, 794 (Ind. Ct. App. 1981); *see also* BLACK'S LAW DICTIONARY, *supra*, at 594. If the tenant fails to vacate within a reasonable time, she waives her claim for constructive eviction. *Auto. Supply Co.*, 340 Ill. at 203; *JMB Props. Urban Co.*, 604 N.E.2d at 969; *Dell'Armi Builders, Inc. v. Johnston*, 526 N.E.2d 409, 412 (Ill. App. Ct. 1988).

We recognize that the analogy to constructive eviction is imperfect. Section 3604(a) concerns making a dwelling "unavailable," not constructive eviction *per se*. Still, the Blochs never moved out. Though the Blochs compare their plight to constructive eviction, they give no reason why they failed to vacate. Instead, they stayed put and resisted (by repeatedly replacing their mezuzot) the defendants' allegedly discriminatory enforcement of

Hallway Rule 1 for over a year before a court enjoined the Rule's enforcement and the Association amended the Rules. Whether "unavailability" means that a plaintiff must, in every case, vacate the premises to have a § 3604(a) claim is an issue we refrain from reaching.[6] But based on these facts, we see no possibility that a reasonable jury could conclude that the defendants' conduct rendered Shoreline Towers "unavailable" to the Blochs, which is what § 3604(a) requires. *See Infinity Broad.*, 869 F.2d at 1078 (holding that district court "correctly declined to render an advisory opinion" where plaintiff sued for constructive eviction but had not yet vacated premises); *Shaker & Assocs.*, 733 N.E.2d at 873 (ten-month delay to find new location deemed unreasonable); *Auto. Supply Co.*, 340 Ill. at 203 (two-month delay after loss of heat deemed unreasonable); *Sigsbee*, 419 N.E.2d at 795 (eight-month delay deemed unreasonable). Section 3604(a) does not contemplate attempted constructive eviction.

The panel dissent raised one other possibility for the Blochs—the Hallway Rule restricted not only the Blochs' ability to live in their unit but also their ability to sell to other observant Jews. To borrow the words

---

[6] Perhaps a future case may require us to reconsider our understanding of constructive eviction, depending on how the Supreme Court treats the potentially analogous concept of constructive termination. *See Marcoux v. Shell Oil Prods. Co.*, 524 F.3d 33 (1st Cir. 2008), *cert. granted sub nom. Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.*, 129 S.Ct. 2788 (June 15, 2009) (No. 08-240).

from the dissent, "Hallway Rule 1 operates exactly as a redlining rule does with respect to the ability of the owner to sell to observant Jews. No such person could buy a unit at Shoreline Towers. The Association might as well hang a sign outside saying, 'No observant Jews allowed.'" *Bloch*, 533 F.3d at 570 (Wood, J., dissenting). Such a sign would undoubtedly violate § 3604(a); hence, so would the Hallway Rule. However, the Blochs never made this argument to the district court, and moreover, offered no evidence that they intended to sell their units and that the Rule's enforcement stifled their efforts. As such, we conclude that the Blochs cannot proceed under § 3604(a).[7]

## B. 42 U.S.C. § 3604(b)

Turning to the second of the three FHA theories, § 3604(b) makes it unlawful "[t]o discriminate against

---

[7] The panel dissent notes that another Shoreline Towers resident, Debra Gassman, whose mezuzah removal we mentioned above, has also filed suit against Frischholz and the Condo Association for the removal of her mezuzah. *See Bloch*, 533 F.3d at 568 (Wood, J., dissenting) (citing *Gassman v. Frischholz*, No. 05-CV-5377 (N.D. Ill.), on appeal, No. 07-2213 (7th Cir.)). Gassman's appeal has been stayed pending the appeal in this case. The dissent discusses the fact that Gassman actually moved out of her unit at Shoreline Towers to return to Israel. *Id.* at 568, 570. Such circumstances might dictate a different result under § 3604(a) than the Blochs' case. However, we refrain from making any conclusions about that case given that the only facts before us are those of *Bloch v. Frischholz*.

any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." Again, our task is to determine whether this provision proscribes the sort of post-acquisition discrimination alleged in this case. Subsection (b)'s language is broad, mirroring Title VII, which we have held reaches both pre- and post-hiring discrimination. *See Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 295 (7th Cir. 2000) ("Courts have recognized that Title VIII is the functional equivalent of Title VII, and so the provisions of these two statutes are given like construction and application." (internal citations omitted)); *DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996) ("[W]e recognize a hostile housing environment cause of action [under the FHA], and begin our analysis with the more familiar Title VII standard."). Nonetheless, *Halprin* found the scope of this provision more limited than Title VII, 388 F.3d at 329, and the defendants rely on *Halprin* to argue that the FHA does not reach any claims of post-acquisition discrimination. We read *Halprin* more narrowly, however, and see two possibilities for relief in this case, only the latter of which is viable for the Blochs.

Like subsection (a), constructive eviction is an option under § 3604(b) as well. As we recognized in *Halprin*, the right to inhabit the premises is a "privilege of sale." 388 F.3d at 329. Deprivation of that right by making the premises uninhabitable violates § 3604(b). *See Cox*, 430 F.3d at 746 ("[Section] 3604(b) may encompass the claim of a current owner or renter . . . for actual or con-

structive eviction."). However, as we just discussed, the Blochs have no constructive eviction claim. So this § 3604(b) avenue is closed to them.

But the "privilege" to inhabit the condo is not the only aspect of § 3604(b) that this case implicates. The Blochs alleged discrimination by their condo association, an entity by which the Blochs agreed to be governed when they bought their units. This agreement, though contemplating future, post-sale governance by the Association, was nonetheless a term or condition of sale that brings this case within § 3604(b).[8] *See Cox*, 430 F.3d at 746 ("[Section] 3604(b) may encompass the claim of a current owner or renter for attempted and unsuccessful discrimination relating to the initial sale or rental."); *Woods-Drake v. Lundy*, 667 F.2d 1198, 1201 (5th Cir. 1982) ("[W]hen a landlord imposes on white tenants the condition that they may lease his apartment only if they agree not to receive blacks as guests, the landlord has discriminated against the tenants in the 'terms, conditions and privileges of rental' on the grounds of 'race.' ").

Shoreline Towers operates under a common plan or "Declaration" that sets forth the rights, easements, privileges, and restrictions subject to which condo owners

---

[8] The defendants seem to recognize this when they remarked at the summary judgment stage, "[A]s a condition precedent to purchasing or residing at Shoreline Towers Condominium Association, they explicitly agreed to be bound and governed by its Declaration and Bylaws." (Defs.' Reply Pls.' Resp. Defs.' Mot. Summ. J. 2.)

take their units upon purchase. Unit owners must, for
instance, pay their share of the expenses of administration,
maintenance, and repair of the building's common ele-
ments. The Declaration also establishes a Board of Man-
agers, elected by the unit owners, to oversee the admin-
istration of the building; the Declaration vests the Board
with the authority to carry out this duty. For example,
the Board can cause certain repairs to the common ele-
ments to be performed at a unit owner's expense. The
Board may also adopt and enforce rules and regulations
that it "deem[s] advisable for the maintenance, admin-
istration, management, operation, use, conservation and
beautification of the Property, and for the health comfort,
safety and general welfare of the Unit Owners and Occu-
pants of the Property." So, upon purchasing their units,
the Blochs agreed to be bound by the enactments of the
Board of Managers, both present and future.

This contractual connection between the Blochs and the
Board distinguishes this case from *Halprin*. *Halprin* made
it clear that § 3604(b) is not broad enough to provide a
blanket "privilege" to be free from all discrimination
from any source. Plaintiffs generally cannot sue under
§ 3604 for isolated acts of discrimination by other
private property owners. Neither the FHA's text nor its
legislative history indicates an intent to make "quarrels
between neighbors . . . a routine basis for federal litiga-
tion." 388 F.3d at 329. As deplorable as it might have
been, the defendants' alleged conduct in *Halprin* was not
linked to any of the terms, conditions, or privileges
that accompanied or were related to the plaintiffs' pur-
chase of their property. But that's what § 3604(b) requires.

Here, however, the Blochs' agreement to subject their rights to the restrictions imposed by the Board was a "condition" of the Blochs' purchase; the Board's power to restrict unit owners' rights flows from the terms of the sale. And the Blochs alleged that the Board discriminated against them in wielding that power. Consequently, because the Blochs purchased dwellings subject to the condition that the Condo Association can enact rules that restrict the buyer's rights in the future, § 3604(b) prohibits the Association from discriminating against the Blochs through its enforcement of the rules, even facially neutral rules.

Allowing certain claims for post-acquisition discrimination to proceed under § 3604(b) is also consistent, as the panel dissent observed, with regulations adopted by HUD, the agency responsible for implementing the FHA. The HUD regulations explain that § 3604(b)'s protections extend to prohibit "[l]imiting the use of privileges, services or facilities associated with a dwelling because of race [or] . . . religion . . . of an owner, tenant or a person associated with him or her." 24 C.F.R. § 100.65(b)(4) (emphasis added). Though a rote application of Chevron deference might be inconsistent with the judicially enforceable nature of the FHA's private right of action, *see Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649-50 (1990); *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 300 (7th Cir. 1992), the Supreme Court has nonetheless recognized that HUD's views about the meaning of the FHA are entitled to "great weight," *Trafficante*, 409 U.S. at 210; *see also NAACP*, 978 F.2d at 300 ("It would be weird to say that Title VIII applies . . . on

judicial review of administrative actions but not when the litigation begins in district court."). Accordingly, if the Blochs produced sufficient evidence of discrimination, we conclude that § 3604(b) could support the Blochs' claim.

### C.  42 U.S.C. § 3617

The Blochs' third and final FHA theory arises under § 3617, which makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." The Blochs argue that § 3617 supports a post-acquisition discrimination claim independent of any allowed under § 3604. "Interference" with the enjoyment of fair housing rights, they argue, encompasses a broader swath of conduct than an outright deprivation of those rights. Supporting the Blochs' position is a HUD regulation, 24 C.F.R. § 100.400(c)(2), which prohibits "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race [or] . . . religion . . . of such persons, or of visitors or associates of such persons." Interference with the "enjoyment of a dwelling" could only occur post-sale. *See East-Miller v. Lake County Highway Dep't*, 421 F.3d 558, 562 (7th Cir. 2005).

Whether a violation of § 3617 can exist without a violation of § 3604 or any other FHA provision is a question

we have routinely reserved. *See South-Suburban Hous. Ctr. v. Greater S. Suburban Bd. of Realtors*, 935 F.2d 868, 886 (7th Cir. 1991) (citing *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1288 n.5 (7th Cir. 1977)). Courts are split on the issue. *Compare Frazier v. Rominger*, 27 F.3d 828, 834 (2d Cir. 1994), *and Reule v. Sherwood Valley I Council of Co-Owners, Inc.*, No. 05-3197, 2005 WL 2669480, at *4 (S.D. Tex. Oct 19, 2005), *with United States v. Koch*, 352 F. Supp. 2d 970, 978-79 (D. Neb. 2004), *and Stackhouse v. DeSitter*, 620 F. Supp. 208, 210 (N.D. Ill. 1985). In some instances, we have held that the circumstances of the case make §§ 3604 and 3617 coextensive—a violation of one necessarily means a violation of the other. *See Arlington Heights*, 558 F.2d at 1288 & n.5 (sections 3604 and 3617 violated if defendant's refusal to rezone was done with discriminatory intent or had discriminatory effect). Here, however, that need not be the case. We know that the Association's enforcement of the Hallway Rule did not constructively evict the Blochs in violation of § 3604(a) or (b). But that does not foreclose the possibility that the defendants "interfered" with the Blochs' enjoyment of their § 3604 rights or "coerced" or "intimidated" the Blochs on account of their having exercised those rights. To hold otherwise would make § 3617 entirely duplicative of the other FHA provisions; though its language is unique in the FHA, § 3617 would have no independent meaning. But "'when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'" *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (quoting 2A N. Singer, Statutes

and Statutory Construction § 46:06, p. 194 (6th rev. ed. 2000)). Coercion, intimidation, threats, or interference with or on account of a person's exercise of his or her §§ 3603-3606 rights can be distinct from outright violations of §§ 3603-3606. For instance, if a landlord rents to a white tenant but then threatens to evict him upon learning that he is married to a black woman, the landlord has plainly violated § 3617, whether he actually evicts the tenant or not. That §§ 3604 and 3617 might overlap in some circumstances is "neither unusual nor unfortunate." *See United States v. Naftalin*, 441 U.S. 768, 778 (1979) (quotation omitted); *NAACP*, 978 F.2d at 298.

Despite the fact that a § 3617 claim might stand on its own, *Halprin* seems to cut the legs out from under it in a case like this. Because § 3604 covers pre-sale conduct, *Halprin* goes, § 3617 is likewise limited to pre-sale "interference" with § 3604 rights. 388 F.3d at 330. But, as we've discussed above, even *Halprin* recognized that § 3604 might not be constrained to purely pre-sale discrimination. Sections 3604(a) and (b) prohibit discriminatory evictions. Eviction, actual or constructive, can only occur *after* the sale or rental is complete. Therefore, "interference" with certain rights protected by § 3604—rights that prohibit discriminatory evictions—may also occur post-acquisition. We recognize this interpretation effectively overrules *Halprin* as far as § 3617 is concerned. But in light of our view that § 3604 prohibits discriminatory evictions, it follows that *attempted* discriminatory evictions can violate § 3617's prohibition against interference with § 3604 rights. Though § 3604 requires that the plaintiffs' dwelling be made truly unavailable, or that defendants

deprived plaintiffs of their privilege to inhabit their dwelling, the text of § 3617 is not so limited. We agree with the Blochs (and the United States, appearing as amicus in this case) that § 3617 reaches a broader range of post-acquisition conduct. A claim for coercion, intimidation, threats, and interference with or on account of plaintiff's § 3604 rights does not require that the plaintiff actually vacate the premises.

We find this construction of § 3617 consistent with Congress' intent in enacting the FHA—"the reach of the proposed law was to replace the ghettos by truly integrated and balanced living patterns." *Trafficante*, 409 U.S. at 211 (internal quotation omitted). Requiring the Blochs to vacate their homes before they can sue undoubtedly stifles that purpose. Moreover, our view is consistent with HUD's interpretation of § 3617. HUD's regulations prohibit "interfering with persons in their *enjoyment of a dwelling* because of the race [or] religion . . . of such persons." 24 C.F.R. § 100.400(c)(2) (emphasis added). As we noted before, a rote *Chevron* analysis might be inappropriate in this private-enforcement context, *see Adams Fruit*, 494 U.S. at 649-50, but we still must give HUD's interpretations of the FHA "great weight," *Trafficante*, 409 U.S. at 210; *NAACP*, 978 F.2d at 300. HUD's regulations confirm that § 3617 can, in appropriate circumstances, apply to post-acquisition discrimination that does not result in eviction.

So the § 3617 question in this case becomes whether the defendants coerced, intimidated, threatened, or interfered with the Blochs' exercise or enjoyment of their right to inhabit their condo units because of their race

or religion. To prevail on a § 3617 claim, a plaintiff must show that (1) she is a protected individual under the FHA, (2) she was engaged in the exercise or enjoyment of her fair housing rights, (3) the defendants coerced, threatened, intimidated, or interfered with the plaintiff on account of her protected activity under the FHA, and (4) the defendants were motivated by an intent to discriminate. *East-Miller*, 421 F.3d at 563. "Interference" is more than a "quarrel among neighbors" or an "isolated act of discrimination," but rather is a "pattern of harassment, invidiously motivated." *Halprin*, 388 F.3d at 330; *cf. DiCenso*, 96 F.3d at 1006; *Honce v. Vigil*, 1 F.3d 1085, 1090 (10th Cir. 1993).

Discriminatory intent is the pivotal element in this case. The Blochs clearly meet the first two elements: they are Jewish and they lived in the condo units they purchased at Shoreline Towers. The defendants also engaged in a pattern of conduct, repeatedly ripping down the Blochs' mezuzot for over a year's time. This conduct would constitute "interference" if it was invidiously motivated—that is, if it was intentionally discriminatory. Thus, like their § 3604(b) claim for discrimination in the terms or conditions of sale and their § 1982 claim, if the Blochs produced sufficient evidence of discrimination, they can proceed under § 3617 for interference with their § 3604 rights.

## IV.  Intentional Discrimination

Whether the Blochs demonstrated a triable issue as to discrimination is the central question that divided the

panel of this court that previously considered this case. Not seeing any evidence of discriminatory animus, the panel majority viewed the Blochs' claim as one seeking a religious exception to a neutral rule of general applicability because the Hallway Rules applied to all objects, not just mezuzot. *Bloch*, 533 F.3d at 565. Under the Supreme Court's reasoning in *Employment Division v. Smith*, 494 U.S. 872 (1990), the Association's failure to grant a "mezuzah exception" is not tantamount to intentional discrimination. That the Blochs' claim arose under the FHA (unlike the Free Exercise Clause of the First Amendment, at issue in *Smith*) doesn't change matters; the FHA requires accommodations only for handicaps, 42 U.S.C. § 3604(f)(3)(B), not for religion. The panel dissent saw the evidence differently—not as a request for accommodation but rather as a straightforward claim for intentional discrimination. From the dissent's view, the record contained evidence sufficient for a factfinder to conclude that the defendants' "reinterpretation" and enforcement of Hallway Rule 1 was intentionally done to discriminate against Jews. *Bloch*, 533 F.3d at 573 (Wood, J., dissenting).

We agree with the panel dissent that the Blochs are not seeking an exception to a neutral rule. Hallway Rule 1 might have been neutral when adopted; indeed, Lynne Bloch voted for the Rule when she was on the Board of Managers. But the Blochs' principal argument is that the Rule isn't neutral anymore. As the dissent put it, "The whole point of the Blochs' case, however, is that the Association, under the guise of 'interpreting' the rule in 2004, transformed it from a neutral one to one that was

targeted exclusively at observant Jewish residents." *Bloch*, 533 F.3d at 572 (Wood, J., dissenting). In essence, the Blochs claim that, after the 2004 hallway repainting project, the Board, by its reinterpretation of Rule 1, effectively enacted a new rule to deprive Jews of an important religious practice.

Generally, plaintiffs can prove discrimination under § 3604 in two ways. Of course, one method requires proof of discriminatory intent. (Section 3617, like § 1982, requires a showing of discriminatory intent. *East-Miller*, 421 F.3d at 563.) In addition, we have held that, in certain circumstances, plaintiffs can sustain a § 3604 claim on a modified disparate impact theory. *Arlington Heights*, 558 F.2d at 1290; *see also Gomez v. Chody*, 867 F.2d 395, 402 (7th Cir. 1989); *Southend Neighborhood*, 743 F.2d at 1210; *cf. Knapp v. Eagle Prop. Mgmt. Corp.*, 54 F.3d 1272, 1280-81 (7th Cir. 1995) (recognizing disparate impact theory but finding it inapplicable in that case); *NAACP*, 978 F.2d at 290 (same); *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1533 (7th Cir. 1990) (same). *But see Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343, 2350 (2009) (finding that similar language in the ADEA provides for a narrower category of discrimination claims).

On appeal, the Blochs argue that they survive summary judgment on both theories. We agree with the defendants, however, that the Blochs have waived the disparate impact option by not developing it during the summary judgment process below. The Blochs seem to recognize their waiver in their briefing, but they contend that the district court went outside the

pleadings on summary judgment and considered disparate impact, which they say entitles them to raise it on appeal. *See Nabozny v. Podlesny*, 92 F.3d 446, 450 (7th Cir. 1996) ("If the court elects to rely on legal arguments and evidence not incorporated in, or submitted with, the summary judgment motion, the court is obligated to consider the entire record 'to ensure that the record reveals no issue of material fact.'" (quoting *Brown v. United States*, 976 F.2d 1104, 1110 (7th Cir. 1992))). But a close reading of the district court's order (and the Blochs' briefing on summary judgment) reveals that the court never considered the disparate impact theory the Blochs advance here. That theory, which is based on our opinion in *Arlington Heights*, 558 F.2d at 1290, involves an intricate four-factor test that balances several competing interests, none of which was ever discussed in the district court's order. This is likely because the Blochs never developed a disparate impact claim under the *Arlington Heights* framework on summary judgment. The Blochs mentioned the words "disparate impact" in just a few off-hand statements in their summary judgment briefs; and they cited *Arlington Heights* only once, and not until their surreply. But they never engaged or even mentioned the four factors required to make out a disparate impact claim. And moreover, they only mention the disparate impact of the Hallway Rules in the context of intentional discrimination, not as an independent argument. This explains why the district court never mentioned *Arlington Heights* in its order. Though the district court did say that the Blochs "offer[ed] no admissible evidence of the disparate impact they claim," it

did so, like the Blochs' briefing, in the context of the Blochs' claim for intentional discrimination—the only theory they presented at summary judgment. Accordingly, we conclude that the Blochs waived any *Arlington Heights* disparate impact argument.[9]

So the Blochs must proceed on a showing of intentional discrimination. Although the Blochs' case is no slam dunk, we think the record contains sufficient evidence, with reasonable inferences drawn in the Blochs' favor, that there are genuine issues for trial on intentional discrimination.

To begin with, the Blochs produced evidence to show that the Association reinterpreted the Hallway Rules in 2004 to apply to mezuzot, and other objects, which the Rules were never designed to reach. In addition to statements from past Board members and evidence that the Blochs' mezuzot were never removed prior to 2004, a common canon of construction supports the Blochs' argument. *See Corley v. United States*, 129 S. Ct. 1558, 1566 (2009) ("[O]ne of the most basic interpretive canons" is "that [a] statute should be construed so that effect is

---

[9] We should note that after the court issued its decision on summary judgment, the Blochs filed a motion to reconsider, where, for the first time, they articulated a disparate impact theory under *Arlington Heights*. But developing an argument for the first time in a motion to reconsider is too late. *See Brooks v. City of Chicago*, 564 F.3d 830, 833 (7th Cir. 2009) ("[A]ny arguments . . . raised for the first time in [a] motion to reconsider are waived." (citation omitted)).

given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant" (quotation omitted)). Hallway Rule 1 prohibits "objects of any sort . . . outside Unit entrance doors." After the 2004 hallway painting project, the Association construed that language to reach doors and doorposts. But Hallway Rule 2 prohibits "signs or name plates . . . placed on Unit doors." So if Rule 1 were originally intended to cover doors and doorposts, Rule 2 would have been superfluous. As such, a trier of fact could conclude that when the Association adopted the Hallway Rules (with Lynne Bloch voting for their adoption), it never intended them to prohibit objects on the doorposts like mezuzot. Viewed in this light, the evidence shows that the Association did not make an exception for the Blochs from 2001 to 2004, only to withdraw that exception after the painting project. Instead, a factfinder could conclude that the Association intentionally reinterpreted the Rules to repeatedly remove the Blochs' mezuzot, thus burdening their religious practices.

As the panel majority correctly observed, though, this evidence alone is insufficient to create a triable issue as to discriminatory intent. The Hallway Rules were applied neutrally after 2004. The Association cleared the doors and doorposts of everything from mezuzot to crucifixes to Christmas decorations to Chicago Bears' pennants. Even if we were to assume that Judaism was the only religion affected by the reinterpretation of the Rules, the reasoning in *Smith* would put the kibosh on the plaintiff's case. *Smith* requires more than just evidence of an adverse impact on observant Jews. Even

the evidence of the Blochs' attempt to amend the Hall-way Rules is insufficient standing alone. Under *Smith*, the denial of a religious exception is not intentional discrimination.

This makes the Blochs' task more difficult, but not impossible. They must show that the Association reinter-preted the Hallway Rules to apply to mezuzot "because of" and not merely "in spite of" the Blochs' religion. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). In other words, the evidence must indicate that the Association was not simply indifferent when it reinterpreted the Hallway Rules; the evidence must show that the Associa-tion reinterpreted the Rules with Jews in mind. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).

The First Amendment "'forbids subtle departures from neutrality' . . . and 'covert suppression of particular religious beliefs.'" *Id.* Concurring in *Lukumi*, Justice Scalia, the author of *Smith*, explained that the First Amend-ment prohibited "laws which, though neutral in their terms, through their design, construction, or enforcement target the practices of a particular religion for discrim-inatory treatment." *Id.* at 557 (Scalia, J., concurring). So, to side with the defendants, we must assume that the "design, construction, or enforcement" of Hallway Rule 1 does not target observant Jews.

That's an assumption we just can't make on this rec-ord. "A finding of discriminatory intent is usually based on circumstantial evidence and the district court must exercise extreme caution in granting summary judgment

in such a context." *Gomez*, 867 F.2d at 402. We think the district court was too hasty here. The Blochs demonstrated that the Association repeatedly removed their mezuzot, even though the Blochs, in complaining and petitioning for the amendment of Rule 1, explained that they were required by Jewish Law to affix mezuzot to the exterior of their doorpost.

The Blochs also produced evidence of animus between Frischholz and Lynne Bloch. In some circumstances, evidence of animus might detract from an intentional discrimination claim—one could assume that the harasser acted out of personal spite instead of improper prejudice. But in this case, the evidence shows more than just a petty spat between neighbors. As early as 2001, Frischholz knew that Lynne Bloch would be offended by removing mezuzot from her doorposts. Still, he approved of their repeated removal from 2004 on. When she confronted him about it, he retaliated. He accused Lynne of being a racist, called her a liar, encouraged other tenants not to elect her to the Board, and told her that if she didn't like the Association's taking down her mezuzot, she should "get out."

Frischholz's comments about the Friday night Board events are also telling. His responses smack of religious bias. He admitted that he was aware of Lynne's religious obligations but he showed utter intolerance for them: "She's perfectly able. She decides not to. . . . She says that she can't attend after sunset, because it is Shavus [sic]." Not only does this admission seem to sum up Frischholz's view of the Blochs' religious beliefs, but it is

fair to infer that Frischholz scheduled the meetings on Friday nights with Judaism in mind. The same inference could be made about Frischholz's views toward mezuzot. The record also supports the view that Frischholz held substantial influence over the Board and its activities. A trier of fact could conclude that Frischholz carried out his contempt for Lynne by using his position of authority to target something he knew was important to the Blochs—their religion.

Perhaps the strongest evidence of anti-Semitic motives, though, occurred during the Shivah after Marvin Bloch's death. Despite the Blochs' request, and the Association's agreement, to keep their mezuzah up during the mourning period, the defendants repeatedly removed it. In fact, as the panel dissent put it, "the defendants waited until the family literally was attending Dr. Bloch's funeral and then removed the mezuzot while everyone was away." *Bloch*, 533 F.3d at 567. Not only that, but the record shows that the defendants selectively enforced the Hallway Rule only against the mezuzah. The coat rack and the table remained in the hallway outside the unit even after the mezuzah was stripped away. Instead of clearing the hallway of these obstacles, the Association's maintenance person pulled down only a six-inch-by-one-inch religious item. Selectively interpreting "objects of any sort" to apply only to the mezuzah but not to secular objects creates an inference of discriminatory intent.

It is the combination of all of these facts and inferences, rather than any single one, that pushes this case beyond summary judgment. A trier of fact could conclude that

the Association's reinterpretation of the Hallway Rule and clearing of all objects from doorposts was intended to target the only group of residents for which the prohibited practice was religiously required. The Blochs can therefore proceed on an intentional discrimination theory under §§ 3604(b), 3617 and 1982. (Because of the reversal of summary judgment on three of the four federal claims, the state law claims must also be reinstated.)

## V. Conclusion

We REVERSE the judgment of the district court on the Blochs' claims under §§ 3604(b), 3617 and 1982, and we AFFIRM its judgment on the § 3604(a) claim. This case is REMANDED for further proceedings consistent with this opinion.