[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-11805
_____

D.C. Docket No. 6:11-cv-00085-PCF-DAB

J. R. HARDING,

Plaintiff-Appellant,

versus

ORLANDO APARTMENTS, LLC,
BEHRINGER HARVARD DISTRICT REIT, LLC,
a Delaware limited liability company,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(April 14, 2014)

Before HULL and BLACK, Circuit Judges, and WALTER,[*] District Judge.

PER CURIAM:

_____

[*] Honorable Donald E. Walter, United States District Judge for the Western District of
Louisiana, sitting by designation.

This case arises from James Harding's claims under the Fair Housing Act (FHA), 42 U.S.C. § 3601, *et seq.*, against Behringer Harvard District Reit, LLC (BHDR), which owns an apartment complex called the District Universal Boulevard Apartments (the District) in Orlando, Florida.  Harding alleged that by failing to remedy certain flaws in the design and construction of the District,[1] BHDR discriminated against people with handicaps in violation of 42 U.S.C. § 3604(f)(1)-(2).  The district court granted BHDR's motion for summary judgment, and Harding appealed.  Upon review, we affirm.[2]

## I.  BACKGROUND

*A.    Statutory Background*

Section 3604 of the FHA deals with discrimination in the sale or rental of housing, and § 3604(f) deals with discrimination against people with handicaps in particular.  Subsection (f) is divided into nine subparts, the first three of which are relevant to this appeal. The first two subparts make certain types of discrimination unlawful:

---

[1] Harding also asserted claims against Orlando Apartments, LLC, the entity that designed and built the District, but those claims are not at issue in this appeal.  BHDR was not involved in the District's design or construction.

[2] We note at the outset that our reasoning differs from that employed by the district court. However, it is well established that "we may affirm the district court's decision [to grant summary judgment] on any adequate ground, even if it is other than the one on which the court actually relied." *Parks v. City of Warner Robins, Ga.*, 43 F.3d 609, 613 (11th Cir. 1995).

[It shall be unlawful—]

(f)(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

[(A)-(C): the buyer/renter or any person associated with him.]

(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—

[(A)-(C): the buyer/renter or any person associated with him.]

Subpart (3) then delineates three types of conduct included in the definition of discrimination for the purposes of subsection (f).  The first two examples, (f)(3)(A) and (f)(3)(B), deal with an owner's refusal to allow a handicapped person to make reasonable modifications and an owner's refusal to make reasonable accommodations, respectively, while the third, (f)(3)(C), deals with discrimination in a dwelling's design or construction:[3]

(3)    For the purposes of this subsection, discrimination includes—

(A)    a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises except that, in the case of a rental, the landlord may where it is reasonable to do so condition permission for a modification on the renter agreeing to restore the interior of the premises to the

---

[3] We refer to the standards established by § 3604(f)(3)(C) as the "design-and-construction guidelines" or the "guidelines."

3

condition that existed before the modification, reasonable wear and tear excepted.

(B)    a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling; or

(C)    in connection with the design and construction of [a covered dwelling], a failure to design and construct those dwellings in such a matter that—

  (i)    the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons;

  (ii)    all the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by handicapped persons in wheelchairs; and

  (iii)    all premises within such dwellings contain the following features of adaptive design:

    (I)    an accessible route into and through the dwelling;

    (II)    light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;

    (III)    reinforcements in bathroom walls to allow later installation of grab bars; and

    (IV)    usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

4

B.      *Factual Background*

Orlando Apartments, LLC owned and built the District in 2009.[4]  In

November 2010, while Orlando Apartments still owned the District, James

Harding and Soy Williams visited the District to test its accessibility.  They found

a number of features they contend fall short of the design-and-construction

guidelines.[5]  One month later, in December 2010, BHDR purchased the District.

Harding subsequently filed a complaint against Orlando Apartments and BHDR

based on these allegedly inaccessible features.

In his first cause of action, Harding asserted a claim against Orlando

Apartments for designing and constructing the District in a discriminatory manner,

---

[4] The parties do not dispute that the District qualifies as a multifamily dwelling under the FHA and is therefore subject to the FHA's design-and-construction guidelines.

[5] Specifically, Harding alleged that Orlando Apartments failed to design and construct the District according to the guidelines, which resulted in the following conditions: (a) no accessible parking at a Walgreen's incorporated into the District, (b) no accessible parking at the District's leasing office, (c) excessive surface slopes on access aisles to guest parking, (d) no "pull/latch side door maneuvering space for forward approach" in the leasing office's women's restroom, (e) inadequate knee space at the bar for wheelchair users in the "cyber lounge," (f) inadequate knee space at tables for wheelchair users in the "cyber lounge," (g) a portion of mailboxes at excessive heights, (h) an excessively high threshold at the entrance to the model unit, (i) an excessively narrow route within the model unit, (j) an excessively high threshold and inadequate door width at the door to the patio in the model unit, (k) inadequate clearance in the model unit's water closet, (l) inadequate floor space in the model unit's bathtub, (m) an excessively high threshold at the door to the patio of the business center, (n) excessive closing speed of the door to the business center, (o) inadequate clearance at the water closet and insufficient knee space at the lavatory in the business center's restroom, (p) protruding fire extinguishers in numerous corridors, (q) excessive threshold heights in the two-bedroom, one-bath units designated as "handicapped units," (r) inadequate width at patio doors in the two-bedroom, one-bath units designated as "handicapped units," (s) an excessively narrow route in the two-bedroom, one-bath units designated as "handicapped units," (t) insufficient door maneuvering space at the pool restroom, (u) excessively high controls at the pool rinse shower, and (v) cross slopes that fail to provide an accessible route at the pool.

5

citing the design-and-construction guidelines.  In his second cause of action,

Harding asserted claims against BHDR under § 3604(f)(1)-(2), alleging that BHDR

"continued to allow the [design-and-construction violations] to exist."  Harding

contended that by failing to remedy the violations, BHDR discriminated against

people with handicaps in violation of the FHA.  Ultimately, the district court

granted summary judgment to BHDR on this claim, and Harding appealed.

## II.  STANDARD OF REVIEW

"We review a district court's grant of summary judgment *de novo*, applying

the same legal standards used by the district court."  *Kingsland v. City of Miami*,

382 F.3d 1220, 1225 (11th Cir. 2004).  Summary judgment is appropriate when,

viewing the evidence and all factual inferences in the light most favorable to the

non-moving party, "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III.  DISCUSSION

This case requires us to determine whether the FHA's design-and-

construction guidelines provide a standard for determining whether discrimination

under subsections (f)(1) and (f)(2) exists outside of the design and construction

contexts.  We hold that the guidelines do not.  Despite the fact that BHDR was not

involved in the design or construction of the District, all of Harding's claims that

BHDR violated subsections (f)(1) and (f)(2) are alleged through the lens of the

6

design-and-construction guidelines in subsection (f)(3). Harding alleged a series of inaccessible conditions resulting from Orlando Apartments' initial failure to comply with the guidelines and argued that BHDR's failure to remedy those conditions constitutes an independent act of discrimination prohibited by the FHA. Harding's underlying premise is that § 3604(f)(3)(C) not only requires designers and builders to adhere to certain standards of accessibility but also imposes an ongoing duty on subsequent owners to ensure that a dwelling conforms to those standards. As the FHA's plain text demonstrates, this premise is erroneous.

The design-and-construction guidelines are prefaced with the phrase "*in connection with the design and construction*" of a covered dwelling. 42 U.S.C. § 3604(f)(3)(C) (emphasis added). This phrase plainly sets a significant limitation on the guidelines' application, and there are substantial justifications for this limitation. For instance, accessible designs that are easy to implement at the design-and-construction phase may be excessively costly and difficult to add once a dwelling has been built. Reading the design-and-construction limitation out of the guidelines would therefore result in requirements that are potentially far more burdensome than Congress intended. In addition, extending the guidelines beyond the design and construction contexts imposes far harsher burdens on the trade of covered dwellings because subsequent owners would be subject to liability for another party's failure to follow the guidelines. Potential owners would need to

7

thoroughly investigate compliance with the guidelines prior to purchasing a covered dwelling or risk liability.

Congress could easily have written the design-and-construction guidelines to establish a general standard of discrimination applicable to all owners of covered dwellings, but instead it included a clear, significant limitation. We cannot read this limitation out of the guidelines. *See Duncan v. Walker*, 533 U.S. 167, 174, 121 S. Ct. 2120, 2125 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute." (internal quotation marks omitted)). We therefore conclude that Harding cannot state a claim under the FHA against BHDR, which was not involved in the design or construction of the District, by reference to § 3604(f)(3)(C).

The FHA's plain text dictates the foregoing conclusion, and we need not look any further. *Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000) (en banc) ("We begin our construction of [a statute] where courts should always begin the process of legislative interpretation, and where they often should end it as well, which is with the words of the statutory provision."). Nonetheless, we note that the FHA's legislative history, as well as administrative guidance provided by the Department of Housing and Urban Development (HUD),[6] support our conclusion.

---

[6] Congress has authorized HUD to implement and administer the FHA, and its interpretations of the FHA are ordinarily entitled to deference. *Meyer v. Holley*, 537 U.S. 280, 287-88, 123 S. Ct. 824, 830 (2003).

8

The FHA's legislative history reflects Congress's understanding that the design-and-construction guidelines would not be applied in other contexts. In the report of the Committee on the Judiciary of the House of Representatives recommending passage of the provisions at issue in this appeal (the House Report), the Committee emphasized the comparative ease of incorporating accessible features into a dwelling at the design-and-construction stage. H.R. Rep. No. 100-711, at 27 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2188 ("The Committee believes that these basic features of adaptability are essential for equal access . . . as well as being easy to incorporate *in housing design and construction*." (emphasis added)); *id.* ("When reinforcements are installed as a part of new construction, there is no aesthetic change to the bathroom and it is of minimal expense. Having to add reinforcements later, however, can be a major structural undertaking with associated expense."); *id.* at 18, 1988 U.S.C.C.A.N. at 2179 (noting that designing dwellings with accessible features would allow occupants with handicaps to "install[] grab bars . . . without major renovation or structural change"); *id.* (describing the statute's "modest requirements" and noting it does "not add significant additional costs" and "does not require . . . the renovation of existing units"). The House Report therefore demonstrates Congress's intent to mitigate the burdens of compliance with the guidelines by applying them only during design and construction when they can be implemented

9

more easily and with less expense.  Adopting Harding's more expansive reading would undermine Congress's purpose in limiting § 3604(f)(3)(C) to design and construction and transform the FHA's "modest requirements" into something far more onerous.

Harding cannot escape the clear import of the FHA's legislative history by pointing to the following statement in the House Report: "To the extent that terms, conditions, privileges, services or facilities operate to discriminate against a person because of a handicap, elimination of the discrimination would be required in order to comply with the requirements of this subsection." *Id.* at 23-24, 1988 U.S.C.C.A.N. at 2184-85.  This quote fails to bolster Harding's claims because he has not shown the existence of discrimination *by BHDR* as the term is used in the FHA.  Instead, Harding has relied on the design-and-construction guidelines, but as we have explained, these guidelines are insufficient to establish the discrimination of a party uninvolved in the design or construction of a dwelling.  Accordingly, the House Report does not conflict with our understanding of the FHA.

HUD's guidance similarly supports our interpretation of the design-and-construction guidelines.  HUD was asked about the applicability of the design-and-construction guidelines to subsequent purchasers and responded with a letter indicating that, subject to exceptions not at issue in the instant case, subsequent owners are not appropriate defendants for claims based on the design-and-

10

construction guidelines.  HUD has also published a frequently-asked-questions page with a similar question and response.  In both cases, HUD's interpretation of the design-and-construction guidelines is consistent with our own.  Harding concedes as much but disagrees with the amount of deference to which HUD's guidance is entitled on the design-and-construction issue.  We decline to address these arguments because our independent reading of the statute leads to the same conclusion HUD reached.  Thus, whether we defer to and rely on HUD's guidance is of no consequence; our decision would be the same in either case.  Suffice it to say that HUD's interpretation of the design-and-construction guidelines could only strengthen our conclusion.

Because the guidelines have no bearing outside of the design and construction contexts, we affirm the district court's grant of summary judgment to BHDR.  When, as in the instant case, a plaintiff attempts to establish a subsequent owner's discrimination purely by reference to conditions that do not comply with the design-and-construction guidelines, his claims must fail.[7]

---

[7] We reject Harding's argument that the design-and-construction violations he alleged are, on their own, sufficient to claim that BHDR, by failing to remedy them, has "made housing unavailable" on the basis of a handicap in violation of subsection (f)(1).  If any party has made the District "unavailable" within the meaning of subsection (f)(1), it is Orlando Apartments, whose design and construction of the District actually produced the alleged violations.  Moreover, Harding has not sufficiently alleged that the violations go so far as to render the District truly "unavailable" to him.  At most, his allegations raise questions of *habitability*, not availability, and subsection (f)(1) addresses only the latter.  *See, e.g.*, *Clifton Terrace Assocs., Ltd. v. United Techs. Corp.*, 929 F.2d 714, 719 (D.C. Cir. 1991) ("A lack of elevator services is a matter of habitability, not availability, and does not fall within the terms of [§ 3604(f)(1)]."); *id.*

11

IV.  CONCLUSION

In this appeal, Harding raises concerns to which we are not unsympathetic; namely, the difficulties people with handicaps can encounter in trying to find suitable, accessible housing.  However, Harding complains of violations of the FHA's design-and-construction guidelines without offering any explanation why the remedy the FHA provides for these violations—i.e., an action against a dwelling's designer or builder—is insufficient.  Instead, Harding attempts to expand the guidelines to reach subsequent owners who have had nothing to do with a dwelling's design or construction.  The plain text of the FHA precludes such an expansion.  We hold that an FHA plaintiff cannot establish the discrimination of a defendant who was uninvolved in the design or construction of a dwelling by reference to the guidelines at § 3604(f)(3)(C).  The district court therefore did not err in granting summary judgment to BHDR.

**AFFIRMED.**

---

at 719-20 ("Although the denial of certain *essential services* relating to a dwelling, such as mortgage financing, sewer hookups, zoning approval, or basic utilities, might result in the denial of housing, this interpretation . . . does not extend [§ 3604(f)(1)] to questions of habitability." (emphasis added)); *see also Bloch v. Frischholz*, 587 F.3d 771, 776-77 (7th Cir. 2009) (en banc) (suggesting a defendant could make housing unavailable in violation of the FHA through a "constructive eviction," which ordinarily requires a plaintiff to show a dwelling is "unfit for occupancy, often to the point that she is compelled to leave" (internal quotation marks omitted)). While we do not resolve the question whether design-and-construction violations can ever render housing unavailable in violation of subsection (f)(1), Harding's allegations are insufficient to make such a claim in the instant case.  We can infer from the design-and-construction violations Harding alleges that the District is less desirable to him, but the violations do not, on their own, support a claim that the District is "unfit for occupancy."  *See Bloch*, 587 F.3d at 777.

12