Deborah J. WINDOM as next friend of Brandon Windom, a minor, Plaintiff Below, Appellant,

v.

William C. UNGERER, W.C. Ungerer Insurance Agency, Michael T. Alpaugh, Michael T. Alpaugh Insurance Agency, Defendant Below, Appellees.

No. 590, 2005.

Supreme Court of Delaware.

Submitted: April 25, 2006.
Decided: June 15, 2006.

Philip M. Finestrauss, Philip M. Finestrauss, P.A., Wilmington, Delaware for appellant.

Stephen P. Casarino, Casarino, Christman & Shal, P.A., Wilmington, Delaware for appellees William C. Ungerer and W.C. Ungerer Insurance Agency.

Paul Cottrell, Tighe, Cottrell & Logan, P.A., Wilmington, Delaware for appellees Michael T. Alpaugh and Michael T. Alpaugh Insurance Agency.

Before STEELE, Chief Justice, HOLLAND and JACOBS, Justices.

STEELE, Chief Justice:

Plaintiff Below, Brandon Windom,[1] was injured while participating in a football practice supervised by the Capital Trail Football League on October 21, 1999. Windom sued the League for his injuries and the League then discovered that it did not have commercial liability insurance. A default judgment was entered against the League and the League assigned any claims it may have had against an insurer to Windom.

Windom brought claims against Michael T. Alpaugh,[2] the League's former Nationwide Insurance agent, and William C. Ungerer,[3] a general insurance agent. Alpaugh wrote insurance for the League through Nationwide Insurance Company until September of 1999. When Nationwide's policy expired, Nationwide and Alpaugh informed the League that Nationwide would no longer issue a commercial liability policy covering the League's activities. Alpaugh, exclusively a Nationwide agent, contacted Ungerer with the League's knowledge to determine if Ungerer, a general agent, could find a carrier that would provide the coverage the League desired. Ungerer received a proposal for insurance coverage from Pawtucket Mutual Insurance Company and the League accepted the proposal. Ungerer then provided the League with a temporary insurance certificate which purported to provide coverage dependent upon payment of a premium until the carrier issued or declined to issue a policy providing the coverage the League desired. On its application for coverage the League supplied both a property address and a mailing

---

1. Deborah Windom brought suit as next friend of Brandon Windom. For ease of discussion we refer to plaintiffs collectively as "Windom."

2. Michael T. Alpaugh and his agency, Michael T. Alpaugh Insurance Agency, are named defendants. We refer to them collectively as "Alpaugh."

3. William C. Ungerer and his agency, William C. Ungerer Insurance Agency, are named defendants. We refer to them collectively as "Ungerer."

address as requested. Ungerer claims he sent a letter to the property address on the application notifying the League that Pawtucket declined to issue a policy. The League asserts it never received the letter. The League further asserts it had reason to believe Pawtucket provided coverage at the time of Windom's injury.

Before the case went to trial, Alpaugh and Ungerer both moved for summary judgment. Alpaugh asserted that he had no duty to notify the League of Pawtucket's declination because he merely acted as a messenger and specifically told the League that he could not provide coverage to them because he worked exclusively with Nationwide. Ungerer acknowledges his duty to notify the League but asserts that he acted reasonably in carrying out that duty by notifying the League that Pawtucket declined to issue a policy by mailing a letter so indicating to the League's property address. The trial judge granted summary judgment to both Alpaugh and Ungerer.

Windom now claims on appeal that the trial judge erred by granting summary judgment in favor of Alpaugh. Windom suggests that Alpaugh had a duty to notify the League of Pawtucket's declination because he acted as a "broker" when he contacted Ungerer to determine if Ungerer could provide coverage to the League and because he relayed all communications between the League and Ungerer. Windom also claims that the trial judge erred by granting summary judgment in favor of Ungerer because Ungerer acted unreasonably in carrying out his conceded duty to notify the League of Pawtucket's declination when he sent a letter to the League's property address rather than the League's mailing address. We find that Alpaugh owed no duty to the League because he merely acted as a messenger between the League and Ungerer. He informed the League, and they clearly knew from past dealings, that he could not provide them with insurance because he dealt exclusively with Nationwide and Nationwide would not renew the League's policy. Moreover, we find genuine issues of disputed material fact about whether Ungerer acted reasonably when notifying the League that Pawtucket declined to issue a policy, by allegedly sending a letter to the League's property's address rather than to its mailing address. Accordingly, the judgment of the Superior Court is affirmed in part, and reversed in part.

## I.

### A. Facts

The League is a junior football program for minors. On October 21, 1999, Windom fractured his femur while participating in a football team evening practice supervised by the League at a site where the lights were inoperable. At the time of Windom's injury, the League did not have commercial liability insurance. The facts surrounding the lack of insurance form the basis of the Windom's claims.

Beginning in 1986, Alpaugh procured insurance for the League through Nationwide. Alpaugh is an exclusive agent for Nationwide. On May 25, 1999, Nationwide notified Alpaugh that it would not renew the League's commercial liability policy when it expired on September 1, 1999. Nationwide also sent notice directly to the League on May 26, 1999. Chris Verucci, President of the League, contacted Alpaugh on June 17, 1999 to discuss Nationwide's decision not to renew the policy. Alpaugh informed Verucci that he could not procure alternative coverage because he dealt exclusively with Nationwide, and suggested that she contact a few other agencies. On September 14, 1999, Alpaugh learned during a telephone conversation with Verucci that the League had

yet to obtain alternative insurance coverage.[4] Alpaugh then told Verucci that he would "check around" to see if he could find a general agent that could procure commercial liability insurance coverage for the League. After his conversation with Verucci, Alpaugh happened to "run into" William C. Ungerer at a local bank. Alpaugh explained the League's situation to Ungerer.[5] Ungerer, who operated a general insurance agency, indicated that he might be able to procure insurance for the League through Pawtucket.

Alpaugh then provided Ungerer with the League's information and, on September 27, 1999, Ungerer sent Alpaugh a proposal for comprehensive general liability insurance coverage for the League, to be underwritten by Pawtucket. Alpaugh contacted Verucci to notify her that he had obtained a proposal from Ungerer. Verucci orally accepted the proposal, and Alpaugh relayed Verucci's acceptance to Ungerer.

Ungerer then prepared an application for coverage for the League to complete.

On September 29, 1999, Verucci and Darla Chaffin, the League's Treasurer, met with Alpaugh to sign the insurance application.[6] Verucci and Chaffin also gave Alpaugh the initial insurance premium payment of six hundred dollars.[7] The next day Alpaugh hand delivered the application and payment to Ungerer. Ungerer gave Alpaugh a certificate of insurance from Pawtucket for Alpaugh to give to the League.[8]

On October 7, 1999, Ungerer received a fax from Pawtucket indicating that it would not issue a policy to the League.[9] Five days later on October 12, 1999, Ungerer also received a letter from Pawtucket in which it declined to issue a policy along with the League's uncashed six hundred dollar check. Ungerer claims that on October 14, 1999 he sent to the League the

4. Verucci called Alpaugh in reference to another matter.

5. In particular, Alpaugh explained that the League needed insurance immediately because the football season had already started.

6. Alpaugh met Verucci and Chaffin at a skating rink where the League was holding a party. Alpaugh claimed that Ungerer assured him that the Pawtucket insurance proposal would be in force and effective on the date the League signed the application. Alpaugh relayed this message to the League, and the League believed it had insurance as of September 29, 1999.

At the meeting Alpaugh explained to Verucci and Chaffin that he "was unable to process the application or have anything to do with the insurance since it was being placed through Ungerer's agency with an insurer other than Nationwide." He further explained that Ungerer's agency "was handling this insurance application and policy and that any questions about it would have to be directed to Mr. Ungerer or his agency."

7. The payment was by check.

8. The certificate was dated September 29, 1999 and listed the policy number as "Pending/Binder," the producer as Ungerer Insurance Agency, the insurer as Pawtucket Mutual, and the insured as the League. After Ungerer gave Alpaugh the certificate, Alpaugh informed Ungerer that the League would need a certificate for each school where football games were played. Ungerer said that was not a problem and "gave [Alpaugh] a completed certificate with instructions to have either the league just photocopy it and insert the names (names of schools), or I (Alpaugh) could do that and give it to them." Alpaugh decided to make the copies and fill in the "certificate holders" names and he then gave all the certificates to the League.

After giving the certificates to the League, Alpaugh had no contact with the League or Ungerer concerning the insurance policy until this lawsuit.

9. Ungerer was surprised at the denial because Pawtucket's underwriter previously had informed Ungerer that there would not be a problem. Pawtucket claimed the potential risk was high and it was not prepared to undertake the risk.

uncashed check together with a letter stating that Pawtucket had declined coverage. Ungerer mailed the letter and uncashed check to the League's property address as indicated on the League's application for insurance.[10] The League claimed that they never received Ungerer's letter and therefore had reason to believe that it had commercial liability insurance coverage in place on the date of Windom's injury. The League asserts that it first learned that it had no coverage when it informed Ungerer and Pawtucket of Windom's injury.

## B. Procedural History

Windom filed a complaint against the League, Ungerer, Alpaugh, and Pawtucket. The League failed to plead, appear, or otherwise defend against Windom's complaint and Windom took a default judgment against the League. The League assigned its rights, if any, under the Pawtucket insurance policy to Windom.[11] Windom then claimed that Alpaugh and Ungerer were negligent by unreasonably failing to fulfill their respective duties to notify the League that Pawtucket had declined to issue a commercial liability policy to the League. Alpaugh and Ungerer moved for summary judgment and the trial judge granted both motions. Windom now appeals the trial judge's grant of summary judgment in Alpaugh's and Ungerer's favor.

## II.

■ We review a trial judge's grant of summary judgment *de novo*.[12] We will affirm a trial judge's grant of summary judgment when, viewing the facts and inferences in the light most favorable to the nonmoving party,[13] there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law.[14]

## A. Windom's claim that the trial judge erred by granting summary judgment in favor of Alpaugh.

■ Windom claims that Alpaugh's actions to help the League procure alternative liability insurance constituted the voluntary assumption of the duties of a professional broker engaged in the insurance business. Windom further claims that Alpaugh, as a professional broker, had a legal duty to notify the League of Pawtucket's decision to decline to issue a policy of commercial liability coverage to the League. Alpaugh claims that he did not owe the League any duty because he merely acted as a messenger and specifically told the League that he could not provide coverage to them because he worked exclusively with Nationwide.

The trial judge assumed for the purpose of argument that Alpaugh acted as a broker with respect to the League and found that "even assuming that Alpaugh acted as a broker with respect to the League, the course of dealing between Alpaugh[ ] and the League did not create an affirmative legal duty requiring Alpaugh to notify the League that its insurance application had been denied by Pawtucket." The reason

---

10. The application for insurance asked for and the League supplied both a mailing address and a property address.

11. Pawtucket eventually settled with Windom and is no longer part of this action.

12. *Pike Creek Chiropractic Center, P.A. v. Robinson*, 637 A.2d 418, 420 (Del.1994) (citing

*Merrill v. Crothall–American, Inc.*, 606 A.2d 96, 99 (Del.1992)).

13. *Williams v. Geier*, 671 A.2d 1368, 1375–76 (Del.1996) citing *Bershad v. Curtiss–Wright Corporation*, 535 A.2d 840, 844 (Del.1987).

14. *Merrill*, 606 A.2d at 99–100; Del.Super. Ct. Civ. R. 56(c).

was that Alpaugh was not contacted by Pawtucket regarding the decision to decline coverage, nor did Ungerer inform Alpaugh of Pawtucket's decision.[15]

The Delaware Insurance Code defines "broker" as "a licensee who, for compensation, negotiates on behalf of others contracts for insurance from companies he or she is not ·appointed."[16]  Here, we find that the uncontested facts demonstrate that Alpaugh did not act as the League's broker.

Alpaugh's actions were limited to those of a messenger.  Alpaugh did not solicit Pawtucket, negotiate with Pawtucket, prepare the League's application, or receive any compensation.  The insurance certificate received by the League listed the producer as Ungerer Insurance Agency, and the insurer as Pawtucket Mutual.  Alpaugh told the League that he acted exclusively for Nationwide and that he could not provide insurance through any other carrier.  He explained that any questions should be directed to Ungerer.  The League knew from past dealings that Alpaugh acted exclusively for Nationwide.  Thus, no reasonable person in the League's position would believe that Alpaugh either acted as the League's broker or held himself out as being capable of doing so.

■ Moreover, the fact that the League never attempted to contact Alpaugh following Windom's accident demonstrates that the League knew that Alpaugh was not its broker and that Alpaugh had no direct relationship with Pawtucket.  Because the uncontested facts demonstrate that Alpaugh was not acting as a broker and that he did not hold himself out as such, we find that he owed no legal duty to the League to notify them of Pawtucket's decision to decline to issue a policy of commercial liability insurance to the League.[17]  We therefore affirm the trial judge's grant of summary judgment to Alpaugh.[18]

**B.  Windom's claim that the trial judge erred by granting Ungerer's motion for summary judgment.**

The trial judge granted Ungerer's motion for summary judgment because there "is no statutory requirement that a decision to decline an insurance application be sent by certified mail ... and it was not unreasonable for Ungerer to use the League's property address instead of the League's mailing address."  Windom claims that the trial judge erred by granting Ungerer's motion for summary judgment because there were genuine issues of material fact in dispute relevant to whether Ungerer acted reasonably or at all in compliance with his duty to inform the

---

**15.**  Windom points out that the trial judge's holding relies on contested facts.  In particular, the trial judge appears to rely on Alpaugh's deposition testimony that Ungerer never informed him of Pawtucket's decision despite the fact that Ungerer claimed that he told Alpaugh of Pawtucket's decision to decline coverage.  We recognize that the trial judge failed to view the facts in the light most favorable to Windom but find the error harmless because we affirm the trial judge's ruling on other grounds (as discussed below), and whether Ungerer told Alpaugh about Pawtucket's declination is not material to our holding.  *See Infra* n. 19.

**16.**  18 Del. C. § 1702(5).

**17.**  Because we find that Alpaugh had no legal duty to notify the League of Pawtucket's declination of coverage, whether or not Ungerer told Alpaugh of Pawtucket's decision is not a material fact in issue.

**18.**  While the judge articulated a different rationale for her ruling in this case, we may affirm on grounds other than those relied on by her.  *Unitrin, Inc. v. American General Corp.,* 651 A.2d 1361 (Del.1995).

League that Pawtucket declined to issue the policy with the coverage the League sought.[19] Ungerer asserts that no genuine issues of material fact are in dispute because he satisfied his duty to notify the League by sending a letter to the League's property address. Ungerer claims that despite the League's denial that it ever received his letter, it is presumed that the League received the letter because it was properly addressed, stamped, and mailed. Therefore, in Ungerer's view, we must find that he satisfied his duty to notify the League because the League has provided nothing to overcome the presumption.

■■■■ "Generally speaking, the law requires that notice be actually received in order to be effective."[20] "The mere deposit in the mail of a notice, under the general law, is not sufficient to bind a person who never receives it."[21] "If the mailed notice is in fact not received, then the notification is without any legal effect."[22] "However, there is a presumption that mailed matter, *correctly addressed,* stamped and mailed, was received by the party to whom it was addressed."[23] "This presumption may be strengthened, weakened or overcome by proof of attendant pertinent circumstances."[24] Merely denying receipt does not rebut the presumption, *but it may create an issue of fact to be determined by the jury.*[25]

■■ Here, there is a genuine issue of material fact in dispute about whether Ungerer reasonably complied with his duty well beyond the League's mere denial that it received the letter Ungerer claims he mailed. It is uncontested that if Ungerer sent the letter, he sent it to the League's listed *property address* even though the application for insurance indicated a different and distinct mailing address. That fact, coupled with the League's assertion it never received the letter, creates a genuine issue of fact material to whether Ungerer acted reasonably—a disputed fact only a jury can resolve. A jury could fairly conclude that there was some meaningful purpose in asking for both a "property" *and* a "mailing" address on the application for a policy as if it were important to the insurer to know if they were different. Windom also provided evidence to

19. It is undisputed that Ungerer had a duty to notify the League of Pawtucket's decision not to provide insurance coverage. Ungerer's counsel conceded the point at oral argument:
THE COURT: What is your understanding of the duty, if any, that Mr. Ungerer owed to the league?
COUNSEL: Well, he undertook to get insurance for the league, there is no doubt about that. He sent in the insurance application, and when the insurance company declined insurance, *his duty was to reasonably notify the league that it did not have insurance coverage.* And that is the issue in the case. Did he reasonably do that. *I think everybody concedes that he should have notified, by proper notice, that there was a declination of coverage.*

20. *State ex rel. Hall v. Camper,* 347 A.2d 137, 138–39 (Del.Super.Ct.1975).

21. *Id.*

22. *Id.*

23. *Id. See also Schneider v. State Farm Mut. Auto. Ins. Co.,* 813 A.2d 1141, 2002 Del. LEXIS 796, at *3 (Del.Supr. Dec. 26, 2002).

24. *Graham v. Commercial Credit Co.,* 194 A.2d 863, 865–66 (Del.Ch.1963).

25. *Jackson v. UIAB,* 1986 WL 11546, 1986 Del.Super. LEXIS 1367, at *5 (Del.Super.Ct. Sept. 24, 1986) ("This presumption may be rebutted, but the addressee's mere denial of receipt is generally not enough to rebut. It may create an issue of fact, however."); 29 *Am.Jur.2d Evidence* § 266 ("... the rule followed by most of the courts is that the denial of the receipt of the letter raises an issue of fact to be determined by the jury. In such cases, the question of the credibility of the rebutting testimony is for the trier of fact.").

suggest that Ungerer never mailed the letter. In particular, Windom produced Alpaugh's deposition testimony which questions the validity of the copy of the letter that Ungerer claims he sent. Therefore, because genuine issues of material fact are in dispute about whether Ungerer reasonably satisfied his conceded duty to notify the League, we must reverse the trial judge's grant of summary judgment in favor of Ungerer.[26]

### III. Conclusion

Based on the foregoing, the Superior Court's grant of summary judgment in favor of Alpaugh is AFFIRMED. The Superior Court's grant of summary judgment in favor of Ungerer is REVERSED, and the case is remanded for trial.

---

**26.** Windom's brief also suggests that there was a genuine issue of material fact in dispute about whether a temporary insurance binder was in effect on September 29, 1999. Windom suggests that this is a material fact because Ungerer would have a heightened notice requirement (e.g. certified mail) if a temporary insurance binder did exist. We do not need to address this issue because Windom's counsel abandoned the issue at oral argument when he claimed that the argument that "Ungerer may have had a heightened duty under the circumstances ... really is not sustainable." The ultimate inquiry is whether Ungerer reasonably satisfied his conceded duty to notify the League of Pawtucket's declination.