# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
# IN AND FOR KENT COUNTY


STATE HUMAN RELATIONS  :
COMMISSION ex rel. BRENDA GREEN;    C.A. No: K13C-01-006 RBY
                      :

            Plaintiff,    :

                      :

    v.    :

                      :

MARY FIELD and DELAWARE  :
COMMUNITY MANAGEMENT, LLC,  :

                      :

        Defendants.    :


*Submitted: November 19, 2014*
*Decided: January 14, 2015*


***Upon Consideration of Plaintiff's***
***Motion for Summary Judgment***
**DENIED**


**ORDER**


Oliver J. Cleary, Esquire, Department of Justice, Wilmington, Delaware for Plaintiff.

Michael P. Morton, Esquire, Greenville, Delaware for Defendants.


Young, J.

## SUMMARY

The origin of the present motion and this lawsuit, is the oft treacherous practice of telling jokes. Even the most well-meaning and cautious jester, treads the line of one day offending her audience by her humor. Dr. Brenda Green ("Plaintiff"), an African-American, was on the receiving end of one of these jokes, one which not only tread, but, in her mind, crossed the line, invoking racial stereotypes as its punchline. The joke was disseminated via email, to the residents of the Village of Nobles Pond ("Nobles Pond"), a retirement community operated by Delaware Community Management, LLC ("DCM"), of which Plaintiff is a resident. The email was also received by Mary Field ("Field" and together with DCM, "Defendants") the manager of Nobles Pond. Despite requests by Plaintiff that the matter be investigated and the offending jester disciplined, Defendants did not involve themselves in the controversy. Plaintiff filed suit, alleging that Defendants' failure to act was discriminatory, constituting a violation of the Delaware Fair Housing Act ("DFHA").

After extensive discovery, Plaintiff has filed a summary judgment motion, seeking a decision concluding the matter. Prior to determining the merits of this motion, this Court necessarily considered a standing issue: the ability of Plaintiff to bring such a claim under the DFHA. The particular section under which Plaintiff bases her claim, 6 *Del. C.* § 4603(b)(2), has not, to this Court's knowledge, been applied to the set of circumstances before the Court. Specifically, a situation involving an allegation of post-acquisition discrimination. A split of authority abounds concerning this issue. § 4603(b)(2), and its federal counterpart

2

42 U.S.C.A. § 3604(b), prohibit discrimination in the sale of dwelling. Courts have struggled with the question of whether there are instances in which these statutes extend beyond the period of the sale. The Court adopts the approach of *Bloch v. Frischholz,* 587 F.3d 771, 779-780 (7th Cir. 1974), finding that there are limited sets of circumstances in which § 4603(b)(2) applies to post-transaction discrimination. The Plaintiff, therefore, has standing to bring this suit under DFHA.

As regards Plaintiff's motion for summary judgment, the Court finds that the factual issues in this case are so complex and unresolved that nothing can be stated as a matter of law. The evidence in this case is largely based upon the back and forth exchanges, and say-so of various actors, requiring credibility determinations. It is for the jury to make such findings. Plaintiff's Motion for Summary Judgment is **DENIED**.

## FACTS AND PROCEDURES

Plaintiff filed a lawsuit against Mary Field ("Field") and Delaware Community Management, LLC ("DCM" and together with Field "Defendants), alleging violations of DFHA. Plaintiff is a resident of Nobles Pond a retirement community located in Dover, DE, that is  operated by DCM.

On August 21, 2011, Theodora Butler ("Ms. Butler"), a fellow resident of Nobles Pond, received an email from another denizen of the housing community,

3

Patricia Schafer ("Ms. Schafer"), which contained the following joke:

> God went to the Arabs and said,
> "I have Commandments for you that will make your lives better."
> The Arabs asked, "What are the Commandments?"
> And the Lord Said, "They are rules for living. "
> "Can you give us an example?
> "Thou shall not kill."
> "Not kill? We're not interested."
> He went to the Blacks and said. "I have Commandments."
> The Blacks wanted an example, and the Lord said, "Honor thy Father and Mother."
> "Father? We don't know who our fathers are. We're not interested."
> Then He went to the Mexicans and said, "I have Commandments."
> The Mexicans also wanted an example, and the Lord said,
> "Thou shall not steal."
> "Not steal? We're not interested."
> Then He went to the French and said, "I have Commandments."
> The French too wanted an example and the Lord said,
> "Thou shall not commit adultery."
> "Not commit adultery? We're not interested."
> Finally, He went to the Jews and said, "I have Commandments."
> "Commandments?" They said, "How much are they?"
> "They're free."
> "We'll take 10."

Ms. Butler, who is African-American, felt that the joke was in poor taste and sent Ms. Schafer a reply, indicating as much. In so doing, however, Ms. Butler also forwarded the email and her response to the Nobles Pond listserv, including Mary Field, the property manager. Included on this listserv was Plaintiff, who too was

greatly offended by the joke.[1]

Ms. Schafer replied to Ms. Butler profusely apologizing for the racially charged joke. In her reply to Ms. Schafer, Ms. Butler accepted her contrition. Ms. Butler did not share this segment of their exchange with the rest of the Nobles Pond community. It is further of note, that Ms. Butler had, on previous occasions, herself emailed jokes to Ms. Schafer. At least one of these communications included a joke whose premise implicated relations between a Catholic Priest and a Nun, a subject that may have been offensive to Ms. Schafer, a self-proclaimed devout Catholic.

Irate as a result of Ms. Schafer's email, Plaintiff and Ms. Butler contacted Field, requesting that she take action. According to Ms. Field, after consultation with DCM's attorneys, she determined the matter was outside the purview of her responsibility, and that she was not legally entitled to intervene. Moreover, DCM felt that the residents had largely resolved the matter on their own. At all relevant times, the residents of Nobles Pond, including Plaintiff, were under the governance of DCM's "Guidelines for a Protected Environment," which among other things, promoted a right to quiet enjoyment within the housing community. According to Plaintiff, these regulations had been enforced against another resident, Edmond Jobbins ("Jobbins"), when his behavior was in violation of this code.

---

[1] The State has further filed a lawsuit on behalf of Ms. Butler against Mary Field and DCM, arising from the same factual circumstances: *State Human Relations Commission, ex rel. Theordora v. Mary Field and Delaware Community Management, LLC*, K13C-01-007 (Del. Super. Ct.).

Unsatisfied with Field's determination, Plaintiff and Ms. Butler filed a complaint with the State Human Relations Commission ("the Commission"), alleging DCM had discriminated against them by allowing such racially offensive conduct to persist in their community. Following an investigation, the Commission found that DCM had violated the DFHA by failing to take action upon the Plaintiff's request.

On January 8, 2013, the Commission filed two separate lawsuits against Field and DCM, one on behalf of Plaintiff, and one on behalf of Ms. Butler, respectively. Discovery has gone forward in both cases, including the depositions of Plaintiff, Ms. Butler, Ms. Schafer, and Ms. Field. On September 15, 2014, both Plaintiff and Ms. Butler filed Summary Judgment Motions in their respective lawsuits.

## STANDARD OF REVIEW

Summary judgment is granted upon showing that there is no genuine issue of material fact, where the moving party is entitled to judgment as a matter of law.[2] The Court views the evidence in the light most favorable to the non-moving party.[3] The moving party bears the burden of showing that no material issues of fact are present, but once a motion is supported by such a showing, the burden shifts to the non-moving party to demonstrate that there is a genuine dispute as to

---

[2] Super. Ct. Civ.R. 56©.

[3] *Windom v. Ungerer*, 903 A.2d 276, 280 (Del. 2006).

material issues of fact.[4]

## DISCUSSION

Plaintiff's discrimination claim against Defendants is based upon the premise that Defendants violated DFHA, by their failure to respond to the complaint concerning racially charged jokes. Plaintiff frames her case in both a treatment claim and an impact claim. As an initial matter, the success of Plaintiff's suit rest upon whether DFHA even applies to the relationship between Defendants and Plaintiff. The specific provision alleged to have been violated, makes it unlawful:

> to discriminate against any person in the terms conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, national origin, religion, creed, sex, marital status, familial status, age, sexual orientation, gender identity, or disability.[5]

Albeit in a footnote on page 26 of their brief, Defendants contend that Delaware case law is rather thin with respect to the application of DFHA. As such, Defendants question whether DFHA covers the present set of facts. Defendants submit this as an issue of first impression. Citing extra-jurisdictional authority analyzing the application of the Federal counterpart to DFHA, the Fair Housing Act ("FHA"), Defendants' argue that 6 *Del. C*. § 4603(b)(2) "applies only to discrimination related to the acquisition or sale of rental housing."[6] The Court understands this argument to

---

[4] *Moore v. Sizemore*, 405 A.2d 679, 680-81 (Del. 1979).

[5] 6 *Del. C*. § 4603(b)(2).

[6] *Lawrence v. Courtyards at Deerwood Ass'n, Inc.*, 318 F. Supp. 2d. 1133 (S.D. Fla. 2004).

mean that once Plaintiffs acquired their respective properties, this provision of DFHA no longer applied to them. Thus, Defendants' decision not to pursue remedial action with regard to the email chain cannot be statutorily discriminatory under DFHA.

Plaintiff seems to recognize that in order to bring a proper claim for discrimination, property management companies such as DCM must be covered by 6 *Del. C.* § 4603(b)(2): "Plaintiff must first establish that the Defendants are subject to the provisions of the DFHA."[7] Plaintiff then proceeds to argue that DCM is, indeed, encompassed by the statute. Likewise turning to extra-jurisdictional authority, Plaintiff cites a number of cases recognizing that where a homeowner is subject to the rules and regulations of a property management company, said company is covered by FHA.[8] Plaintiff argues, by analogy, that a property manager is also, therefore, covered by DFHA.

Plaintiff assumes, that for purposes of this lawsuit, DFHA is applicable. Defendants rightfully raise the concern that Delaware courts have not dealt with this issue previously, and in order for this Court to proceed, it would have to make a determination of first impression.

Before any ruling can be made as to whether or not there are material issues of fact in dispute, the Court must first decide whether Plaintiff may bring this suit. That

---

[7] Plaintiff 's Motion for Summary Judgment, at pg. 11.

[8] *See Avato v. Green Tree Run Condo Cmty Ass'n*, 1998 WL 196397, at *4 (E.D. Pa. Apr. 22, 1998); *Bloch v. Frischholz,* 587 F.3d 771, 779-780 (7th Cir. 1974).

is an issue of standing, requiring either a statutory grant or constitutional grant.[9] The parties having addressed this issue, however tangentially, with respect to a statutory grant, the "real determinant is the statutory language itself."[10]

With respect to the application of DFHA to present set of circumstances, two central questions exist: 1) Are property managers subject – in general – to DHFA; and 2) is DCM covered – specifically – by § 4603(b)(2). As a starting point, the Plaintiff has established the similarities between FHA and the DFHA.[11] Furthermore, given the little Delaware authority construing the DFHA, Delaware Courts recognize the persuasiveness of case law interpreting its federal counterpart FHA.[12] Therefore, the parties' citations to extra-jurisdictional decisions are well taken.

As regards the first issue, whether property managers fall under the governance of DFHA, courts have generally so held in regard to the FHA.[13] The Court sees no reason to dispute such reasoning. More and more people purchase residences in development communities that are often built and operated by property managers. The law adapts to the realities of human habitation. Just as an individual seller of a

---

[9] *See Newark Landlord Ass'n v. City of Newark*, 2003 WL 21448560, at *5 (Del. Ch. Jun. 13, 2003).

[10] *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.,* 636 A.2d 892, 900 (Del. 1994).

[11] *e.g.*, the language contained in § 4603(b) is almost identical to the FHA's mirror provision 42 U.S.C.A. § 3604(b).

[12] *See e.g.*, *Newark Landlord Ass'n,* 2003 WL 21448560 at *6, n.33 (court turned to extra-jurisdictional analysis of FHA, the federal counterpart to DFHA in its reasoning).

[13] *See e.g., Avato*, 1998 WL 196397, at *4; *Stewart v. Furton*, 774 F.2d 706, 707 (6th Cir. 1985); *Jeanty v. McKey & Pogue, Inc.*, 496 F.2d 1119, 1120-1121 (7th Cir. 1974).

home would be subject to the DFHA, a property manager often substituting the role of a seller, should likewise be subject to this statute. Indeed, Delaware courts have applied the DFHA to condominium associations, also not conventional sellers.[14]

The second, and far more complicated determination, is whether § 4603(b)(2) provides Plaintiff with a right to sue DCM. More importantly, the question is whether DCM is covered by § 4603(b)(2), given the facts at issue. The resolution of this issue, as the Court sees it, is whether § 4603(b)(2) applies to post-acquisition discrimination. § 4603(b)(2) refers specifically to discrimination occurring during "the sale...of a dwelling." The discrimination alleged by Plaintiff took place after she had purchased her unit in the community. A narrow reading of § 4603(b)(2) would end the discussion here. Indeed, this is the interpretation advocated by Defendants. In support of their position, Defendants cite to *Lawrence v. Courtyard at Deerwood Ass'n, Inc.*, a Florida case, whose facts are quite similar to the instant matter.[15] In *Lawrence*, two African-American Plaintiffs brought a suit under 42 U.S.C.A. § 3604(b) § 4603(b)(2)'s federal counterpart),alleging that the property manager of their housing development had permitted a racially hostile environment to exist.[16] The *Lawrence* Court held that Plaintiffs's suit could not be brought under this statute as its coverage was limited temporally to the time of the sale: "sections 3604(a) and (b)

---

[14] *See e.g., State Human Relations Comm'n ex rel Aburrow v. Sea Colony Recreational Ass'n,* 2009 WL 3326630, at *1 (Del. Super. Ct. Oct. 14, 2009).

[15] 318 F.Supp.2d 1133.

[16] *Id.*

are limited to conduct that directly impacts the *accessibility* of housing..."[17] Further, "the FHA was [not] passed...to become some all purpose civility code regulating conduct between neighbors."[18]

Plaintiff argues for a different reading of § 4603(b)(2), that articulated by the Seventh Circuit in *Bloch v. Frischholz*.[19] There, the Court was faced with a condominium association that forbade residents placing objects outside of unit entrance doors.[20] Two Jewish Plaintiffs wished to place a mezuzah outside of their door, as is customary in their faith, and filed suit against the association.[21] Relying, again, upon the federal counterpart to § 4603(b)(2), the Plaintiffs argued that the regulation prohibiting objects in entry doors, was a discriminatory, "term, condition... of sale...of a dwelling," agreed to by the Plaintiffs at the time of the transaction.[22] The Court accepted Plaintiff's position, holding that the statute extended beyond the time of acquisition, in the event the alleged discrimination arose out of a term or condition the buyer agreed to be governed by.[23]

---

[17] *Id.,* at 1143 (emphasis added).

[18] *Id.* (internal quotations omitted).

[19] 587 F.3d 771.

[20] *Id*.

[21] *Id.*

[22] *Id.*, at 779-780 (citing 42 U.S.C.A. § 3604(b), prohibiting in relevant part, "discriminat[ion] against any person in the **terms, conditions**...of sale...of a dwelling")(emphasis added).

[23] *Id.*

The split in authority on this issue, and the facts underlying this case, make this decision a close one. Ultimately, however, this Court adopts the *Bloch* Court's view of post-acquisition statutory application. This is primarily due to the fact that the *Lawrence* Court's holding is much too narrow, given the purpose of the FHA, and by analogy, the DFHA to promote: "open, integrated residential housing patterns and prevent the increase of segregation in ghettos, of racial groups whose lack of opportunities the Act was designed to combat."[24] Moreover, "[i]n order to achieve its purpose, the provisions of the FHA are to be construed *broadly*."[25] To follow the *Lawrence* Court would permit instances of housing discrimination to slip through the cracks.

In addition to the broader interpretation of § 4603(b)(2) being more in line with the purpose of the DFHA, the Court also finds that the *Bloch* approach does not, necessarily, contradict the holding in *Lawrence*. The *Bloch* Court intimated as much, stressing that the statute in question extended to the post-acquisition period in the limited circumstance, where Plaintiffs had agreed to be governed by terms of the property manager or housing association.[26] Temporally, this is still in line with the *Lawrence* Court's interpretation as the terms existed, and the Plaintiffs were bound

---

[24] *Otero v. New York City Housing Auth.*, 484 F.2d 112,1134 (2d. Cir. 1973).

[25] *Lawrence*, 318 F.Supp.2d at 1141 (citing *Trafficante v. Metropolitan Life Ins. Co.,* 409, U.S. 205, 211-212 (1972)) (emphasis added); *see also City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995) (the FHA is read to be "broad and inclusive").

[26] 587 F.3d at 780 ("the Blochs' agreement to subject their rights to the restriction imposed by the Board was a condition of the Blochs' purchase; the Board's power to restrict unit owners' rights flows from the terms of the sale").

by them, beginning at the execution of the sale.

Such is the circumstance arising from Plaintiff's claim in the case at bar. Plaintiff's argue that DCM requires residents to abide by a certain code of conduct – here called the "Guidelines for a Protected Environment." Briefly, these guidelines forbid residents from interfering with the quiet enjoyment of other residents. The Court understands the Plaintiff's contention to be that by not taking disciplinary action for the racial slur, DCM failed to enforce conditions to which Plaintiff was contractually bound. Thus, DCM allegedly manifested disparate, discriminatory treatment toward Plaintiff in the enforcement ,or lack thereof, of these conditions.[27] Under the *Bloch* approach adopted by this Court, such a claim, though temporally post-acquisition, still falls under § 4603(b)(2), as the "Guidelines for a Protected Environment," bound Plaintiff at the time of sale. Therefore, the Court determines that the allegations contained in Plaintiff's claim, if true, create statutory standing to bring a claim under § 4603(b)(2) of the DFHA.

The Court must next determine whether the material facts are undisputed, such that no reasonable juror could find otherwise. The convoluted nature of the evidence, consisting primarily of a long chain of emails back and forth, and centered on whether a joke was merely a joke, or rather intended as a racial slur, belies any determination that material facts are undisputed.

Plaintiff frames her suit as both  disparate treatment and impact claims. Again, the authority from which Plaintiff draws is mostly extra-jurisdictional. According to

---

[27] *See Bloch*, 587 F.3d at 780 ("§ 3604(b) prohibits the Association from discriminating against the Blochs through its ***enforcement*** of the rules, even facially neutral rules")(emphasis added).

this out-of-state case law, an FHA claim, and by analogy, a claim under DFHA, may be brought under both disparate treatment and impact theories. "Disparate treatment analysis focuses on whether the defendant treated the plaintiff less favorable than others."[28] "Disparate impact does not require the plaintiff to show the policy or practice was formulated with discriminatory intent."[29]

The bulk of Plaintiff's argument rests upon the fact that, while Field and DCM did not act upon her complaint regarding Ms. Schafer's off-color humor, they had previously resolved a controversy involving another resident, Jobbins. In 2011, Jobbins had been accused by other residents of Nobles Pond of harassment, including knocking on their doors and petulantly voicing his opinions and displeasures. The disparate treatment alleged, rests upon the fact that the residents who complained of Jobbins' erratic behavior were Caucasian, while Plaintiff is African-American. Furthermore, while DCM chose to intervene in the Jobbins affair, it chose to remain uninvolved in the email joke debacle. According to Plaintiff, this difference in action shows either a discriminatory policy or at least, a discriminatory impact as Caucasian residents received preferential treatment.

Defendants respond to Plaintiff's allegations by stressing the difference in severity, between the email joke incident, and the Jobbins situation. Jobbins' harassing conduct had been ongoing, and the complaining residents were unable to resolve the issue on their own. Indeed, DCM had to write two letters to Jobbins,

---

[28] *Fair Housing of the Dakotas, Inc. v. Goldmark Property Management, Inc.*, 778 F.Supp.2d 1028, 1037 (D.N.D. 2011) (internal quotations omitted).

[29] *Id.* (Internal quotations omitted).

ordering him to cease the offending conduct. By contrast, as is evidenced in the lengthy email exchanges between Plaintiff and Ms. Schafer, the two women were able to amicably workout their differences. Upon receipt of Ms. Butler's disapproving email, Ms. Schafer immediately apologized, and as far as the Record is concerned, did not continue sending racially offensive jokes to Plaintiff, or anyone at Nobles Pond. It is Defendants' contention that they did not involve themselves in the dispute between these two residents, because it had already been resolved by the time they were notified of it. Moreover, upon advice of counsel, they were told that they did not have the legal authority to intervene.

On a motion for summary judgment, where there are material issues of fact in dispute, whose resolution is necessary to decide the case, the Court must deny a motion for summary judgment. Defendants' version of the events, is equally as probable as Plaintiff's assertion of discriminatory conduct. The Defendants present a neutral motivation behind the alleged disparate treatment afforded Plaintiff, that did not involve race. The credibility of this motivation is for the jury to decide. Further, the Court finds that there is disagreement regarding whether a racial slur occurred to begin with; and if it had, whether the Plaintiff and Ms. Schafer had not resolved the matter on their own. The material facts in this case are not so settled as to warrant judgment as a matter of law for Plaintiff, or for Defendants, for that matter..

## CONCLUSION

The evidence extant demonstrates the existence of a genuine factual dispute which is not suitable for resolution by summary judgment. Plaintiff's motion is **DENIED**.

**IT IS SO ORDERED**.


           <u> /s/ Robert B. Young   </u>
                  J.


RBY/lmc
oc: Prothonotary
cc: Counsel
   Opinion Distribution
   File